**COMMONWEALTH of Pennsylvania**

v.

**Alfonso F. CARTER, Appellant.**

Superior Court of Pennsylvania.

Submitted May 25, 2004.

Filed Oct. 29, 2004.

958 

Francis M. Socha, Harrisburg, for appellant.

James P. Barker, Asst. Dist. Atty., Harrisburg, for Com., appellee.

BEFORE: HUDOCK, JOYCE, MUSMANNO, KLEIN, BENDER, BOWES, GANTMAN, McCAFFERY and PANELLA, JJ.

OPINION BY BENDER, J.:

¶ 1 Alfonso F. Carter appeals from the May 29, 2002 order denying relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–46. We reverse and remand for a new trial.

¶ 2 In a memorandum opinion this Court filed in this case on Appellant's direct appeal, we set forth the following factual recitation:

> The incident occurred at approximately 6:15 p.m., on the evening of March 18, 1998. Officer Brenda Holmes of the Harrisburg City Police department was patrolling Hall Manor in Harrisburg. As Officer Holmes approached 44 Hall Manor, she observed a vehicle in the parking area. The vehicle was unattended with its keys in the ignition, its lights and windshield wipers on and its engine running. Being in a high crime area, Officer Holmes was concerned that someone may steal the unattended vehicle. Officer Holmes exited her patrol car and called dispatch to determine the vehicle's owner. At this time, a black male, later identified as Appellant, approached Officer Holmes. Appellant told the officer that he was the owner of the vehicle and that he was driving the car. Officer Holmes asked Appellant for some identification to confirm that the vehicle was Appellant's or if Appellant knew the owner of the vehicle. Appellant told Officer Holmes that he was "Kevin Watson" and gave a date of birth. At about this time, Officer Holmes learned that the vehicle was registered to a female. After running a check on "Kevin Watson" and learning that his actual date of birth did not correspond to the one given by Appellant, Officer Holmes became suspicious and called for backup. A black female approached Officer Holmes and Appellant. The female informed Officer Holmes of a second name for Appellant. Eventually, Appellant identified himself as "Alfonso Carter." Officer Holmes conducted a records check of "Alfonso Carter" and discovered a summary warrant.
>
> Officer Holmes arrested Appellant and placed him in custody. At this time, Officer Holmes searched Appellant and discovered thirty-five empty blue ziplock baggies in his jacket pocket. The officer then brought Appellant to the downtown police station. During the search at the police station, Officer Homes discovered a plastic bag that contained over sixty rocks of suspected crack cocaine. A field test was conducted on the "rocks", and they tested positive for cocaine.

*Commonwealth v. Carter*, No. 330 MDA 1999 unpublished memorandum at 2–3, 748 A.2d 767 (Pa.Super. filed October 22, 1999) (footnote omitted).[1]

¶ 3 On January 12, 1999, following a nonjury trial, the trial court convicted Appellant of possession with the intent to manufacture or deliver a controlled substance, 35 Pa.C.S. § 780–113(a)(30). On the same date, the trial court sentenced Appellant to five to ten years' imprisonment. Appellant obtained new counsel and filed a timely direct appeal, but our Court affirmed his judgment of sentence.

1. The table citation for this case can be found at 748 A.2d 767.

*Id.*[2]

¶ 4 On September 11, 2000, Appellant, acting *pro se,* filed a PCRA petition. The court appointed counsel, who filed an amended PCRA petition on October 11, 2000. On May 29, 2002, the trial court dismissed the petition without a hearing. Appellant filed a timely notice of appeal. The appeal was first presented to a three-judge panel of this Court, but we later granted reargument and *en banc* consideration. *Commonwealth v. Carter,* 2003 Pa.Super. LEXIS 4471 (filed December 5, 2003).

¶ 5 Appellant argues that his constitutional right to confrontation was violated when the trial court permitted the Commonwealth to admit into evidence a report, prepared by a Pennsylvania State Police crime laboratory, to prove the existence of cocaine from items seized from Appellant following his arrest. More specifically, Appellant argues that the trial court erred by permitting the crime lab manager, Larry L. Reigle, to provide the expert testimony with regard to the report in lieu of the testimony of the forensic scientist, Edward J. Kozlusky, who actually performed the mechanics of the test to determine the presence of cocaine in the items seized from Appellant. Pursuant to the lab manager's testimony, the trial court admitted, over defense counsel's objection, the report

itself as substantive evidence.[3] Appellant couches this issue in terms of appellate counsel's ineffectiveness for failing to raise the issue on direct appeal. He makes no claim with regard to trial counsel's ineffectiveness on this issue, nor could he since trial counsel objected and properly preserved the issue for appeal.[4]

■ ¶ 6 Our standard of review in an appeal from an order which has dismissed a petition for relief under the PCRA is well settled:

This Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error.

*Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516, 520 (1997). Moreover,

To be entitled to relief under the PCRA, a petitioner must plead and prove by a preponderance of the evidence that the conviction or sentence arose from one or more of the errors enumerated in 42 Pa.C.S.A. § 9543(a)(2), and that the issues raised in the petition have not been previously litigated or waived. 42 Pa.C.S.A. § 9543(a)(3). An allegation of error is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state

---

2. On direct appeal, our Court determined that the trial court did not err in denying Appellant's motion to suppress and further held that the searches of Appellant's person were lawfully conducted. Consequently, we affirmed Appellant's judgment of sentence. *See Carter,* No. 330 MDA 1999.

3. Specifically, the report was admitted as Commonwealth Exhibit # 4. N.T. Trial, 1/11–12/99, at 72. Although the exhibit is not in the certified record, the contents of the exhibit are well-described in the record and in the parties' briefs. Additionally, the parties are in agreement that the report identified the

substance seized from Appellant as containing cocaine.

4. The other issues Appellant raises in this appeal include a claim that the trial court should have granted a continuance and a claim that trial counsel improperly elicited testimony about Appellant's prior drug conviction. These issues, as well as the one we review herein, are also couched in terms of ineffective assistance of counsel. *See* Appellant's brief at 24–25. However, because of our disposition herein, we need not review these other issues.

postconviction proceeding." 42 Pa. C.S.A. § 9544(b).

*Commonwealth v. Payne*, 794 A.2d 902, 905 (Pa.Super.2002). "A petitioner can avoid a finding of waiver under the PCRA by making an adequate and properly layered claim of ineffective assistance of counsel at his first available opportunity to do so." *Commonwealth v. Rivera*, 816 A.2d 282, 287 (Pa.Super.2003) (quoting *Commonwealth v. Abdul–Salaam*, 570 Pa. 79, 808 A.2d 558, 560, n. 3 (2001)).

¶ 7 Since Appellant claims that his appellate counsel was ineffective for failing to raise the issue pertaining to the lab report on direct appeal, we recognize the following with regard to ineffectiveness claims:

> To prevail on a claim alleging counsel's ineffectiveness under the PCRA, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without any reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, *i.e.*, there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different.

*Commonwealth v. Malone*, 823 A.2d 931, 934 (Pa.Super.2003) (citation omitted). With these rules in mind, we proceed to review Appellant's claim that appellate counsel was ineffective for failing to raise the issue of trial court error in admitting the lab report. The underlying standard of review with regard to a trial court's evidentiary rulings is as follows:

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Herb*, 852 A.2d 356, 363 (Pa.Super.2004) (citations omitted).

¶ 8 The lab report at issue indicated the presence of 11.6 grams of cocaine from the material seized from Appellant. The forensic scientist who conducted the testing on the material and prepared the report, Mr. Kozlusky, was not available to testify. Thus, the Commonwealth called the lab manager, Mr. Reigle, to testify about the contents of the report. Over trial counsel's objection, the trial court admitted the actual report itself as substantive evidence. Appellant claims that the trial court erred in overruling trial counsel's objection (and that appellate counsel was ineffective for failing to raise this issue on direct appeal), because the lab report constituted hearsay evidence that did not qualify for any exceptions to the hearsay rule. The trial court agreed that the report constituted hearsay but determined it was, nevertheless, admissible under the hearsay exception provided in Pa.R.E. 803(6), which exception permits admission of records of regularly conducted activity, commonly referred to as the "business records exception" to the hearsay rule.

¶ 9 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801 ("Definitions"). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." *Id.* The "declarant" is the "person who makes a statement." *Id.* "Hearsay is generally inadmissible at trial unless it falls into an exception to the hearsay rule." *Commonwealth v. McEna-*

*ny,* 732 A.2d 1263, 1272 (Pa.Super.1999). *See also* Pa.R.E. 802 ("Hearsay is not admissible except as provided by these rules [of evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute."). "The rationale for the hearsay rule is that hearsay is too untrustworthy to be considered by the trier of fact. Exceptions have been fashioned to accommodate certain classes of hearsay that are substantially more trustworthy than hearsay in general, and thus merit exception to the hearsay rule." *Commonwealth v. Bean,* 450 Pa.Super. 574, 677 A.2d 842, 844 (1996) (citations omitted).

■ ¶ 10 Certainly, the lab report in the instant case constituted a written statement asserted by a declarant, *i.e.,* Mr. Kozlusky, the forensic scientist who actually performed the test. The information in the report, indicating that the substance confiscated from Appellant contained cocaine, was intended as an assertion of the existence of cocaine, which is an essential element of the crimes charged herein and was, therefore, intended to prove the truth of the matter asserted. Accordingly, the evidence constituted hearsay.

■ ¶ 11 Although the Commonwealth agrees that the lab report constitutes hearsay evidence, it argues that the trial court properly admitted the report under the business records exception to the hearsay rule. Pa.R.E. 803(6) ("Records of Regularly Conducted Activity"). This exception reads as follows:

**Rule 803. Hearsay exceptions; availability of declarant immaterial**

The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

(6) Records of Regularly Conducted Activity.

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Pa.R.E. 803(6). However, "[r]ecords prepared in anticipation of litigation traditionally have been deemed outside the reach of the business records exception." *State of Wisconsin v. Williams,* 253 Wis.2d 99, 644 N.W.2d 919, 929 (2002) (citing *Palmer v. Hoffman,* 318 U.S. 109, 113–14, 63 S.Ct. 477, 87 L.Ed. 645 (1943)). For example, in *Commonwealth v. McEnany,* 732 A.2d 1263, 1273 (Pa.Super.1999), this Court indicated that a cellular phone company's records of cellular telephone calls, kept by the company in the ordinary course of business primarily to resolve billing disputes, was not prepared in anticipation of litigation or prosecution and was, therefore, properly admitted under the business records exception to the hearsay rule. As we shall explain, the opposite is true in the instant case.

¶ 12 The Supreme Court of Wisconsin addressed the exact same issue presented in the instant case, *i.e.,* whether a lab report identifying illicit drugs fell under the business records exception to the hear-

say rule. *Williams,* 644 N.W.2d at 929. The Court examined cases from various jurisdictions to answer this question. They found that "some jurisdictions have held that lab reports, ... like those at issue here, may fall within the business records exception." *Id.* (citing *United States v. Baker,* 855 F.2d 1353, 1359 (8th Cir.1988); *State v. Cosgrove,* 181 Conn. 562, 436 A.2d 33, 37 (1980); *State v. Kreck,* 86 Wash.2d 112, 542 P.2d 782, 785 (1975)). *See also, e.g., United States v. Roulette,* 75 F.3d 418, 422 (8th Cir.1996) (relying on *Baker* to conclude that lab report identifying drug as cocaine was admissible under business records exception). The Court also found, however, that other jurisdictions have held that such reports do not qualify for the business records exception. *Williams,* 644 N.W.2d at 929 (citing *United States v. Oates,* 560 F.2d 45, 68 (2d Cir.1977), *aff'd,* 591 F.2d 1332 (2d Cir. 1978); *State v. Rivera,* 515 A.2d 182, 184, 187 (Del.Super.Ct.1986); *People v. McClanahan,* 191 Ill.2d 127, 246 Ill.Dec. 97, 729 N.E.2d 470, 474 (2000); *State v. Kennedy,* 7 S.W.3d 58, 67 n. 8 (Tenn.Crim.App. 1999)). *See also, e.g., Barnes v. State,* 704 So.2d 487, 494–496 (Ala.Crim.App.1997) (concluding that court erred by admitting lab report into evidence where technician who wrote report did not testify). In examining the difference between the two groups of cases, the Wisconsin Court stated succinctly:

> [W]e have identified a fundamental underlying tension between the fact that crime lab reports may be records of regularly conducted activity and the fact that they are also records prepared in anticipation of litigation. Records prepared in anticipation of litigation traditionally have been deemed outside the reach of the business records exception.

*Williams,* 644 N.W.2d at 929. The Court indicated that certain commentators agreed with the position that lab reports, prepared in anticipation of litigation, pose special problems when it comes to indicia of reliability because the motivation behind making the report is to prosecute drug offenses and, although rare, these reports can be falsified. *Id.* (citing 1 Scientific Evidence § 6.2(C), 313 and 7 Wisconsin Practice § 803.6, 627 (2d ed.2001)). *See also, e.g., Kennedy,* 7 S.W.3d at 67 n. 8 ("Business records are deemed reliable because they are prepared for other uses and are only incidentally prepared for purposes of litigation."). We have examined the cases cited in the Wisconsin opinion, as well as additional multi-jurisdictional cases, and we agree that those jurisdictions that have held that lab reports (like the one here) that come within the business records exception (*e.g., Baker, Cosgrove, Kreck, Roulette* ) have failed to consider, as a general matter, the principle that reports prepared for the purpose of litigation or prosecution do not qualify for the exception.

¶ 13 In Pennsylvania, we recognize the general principle that documents, reports, *etc.,* prepared in anticipation of litigation (which includes prosecution of a criminal offense) do not qualify for the business records exception. *Cf. McEnany,* 732 A.2d at 1273. Obviously, the lab report on the substance seized from Appellant was prepared in anticipation of a criminal prosecution, by a laboratory under the aegis of the Pennsylvania State Police, in order to establish a critical element of the drug offense, *i.e.,* the existence of a controlled substance. Accordingly, we need go no further to conclude that the trial court abused its discretion by misapplying the business records exception and admitting the lab report as substantive evidence in this case.

¶ 14 Despite the fact that the lab report constitutes hearsay evidence that

does not qualify for the business records exception, we must next determine if admission of the report constituted harmless error. In doing so, "[w]e recognize that 'where the evidence at issue does not satisfy an exception to the hearsay rule, confrontation rights [under the United States and Pennsylvania Constitutions] are implicated.'" *Commonwealth v. Raab,* 845 A.2d 874, 877 (Pa.Super.2004) (quoting *Commonwealth v. Romero,* 555 Pa. 4, 722 A.2d 1014, 1018 (1999) (footnoted omitted)).[5] In the context of a violation of the constitutional right to remain silent, our Supreme Court stated:

> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant. The burden of establishing that the error was harmless rests upon the Commonwealth.

*Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 214–15 (2003) (citation omitted). Claims of constitutional error, such as the one presented herein, may be subject to a harmless error analysis. *See Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 506 (1995) ("[A] violation of a defendant's right to confront witnesses against him may constitute harmless error if the admission could not have influenced the outcome of the case.").

¶ 15 In conducting our harmless error analysis, we first examine the interplay between the hearsay rule and the constitutional right of a defendant to confront and cross-examine witnesses. Indeed, the admission of the lab report into evidence at trial implicates the federal and state constitutional right of confrontation and cross-examination of witnesses. The Sixth Amendment to the federal Constitution, applicable to the states via the Fourteenth Amendment, provides that a defendant in a criminal case "shall enjoy the right ... to be confronted with the witnesses against him." *Commonwealth v. Ludwig,* 527 Pa. 472, 594 A.2d 281, 282 (1991) (quoting U.S. CONST. amend. VI); *Commonwealth v. Thomas,* 443 Pa. 234, 279 A.2d 20, 23 (1971). The Pennsylvania Constitution provides the analogous state constitutional provision in Article I, section 9 ("Rights of accused in criminal prosecutions"). Specifically, this section provides that "[i]n all criminal prosecutions the accused hath a right ... to be confronted with the witnesses against him...." PA. CONST. art. I, § 9. The United States Supreme Court has succinctly outlined the purposes of the right to confront witnesses:

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

---

5. The converse of this rule was well-stated in *Commonwealth v. Ransom,* 446 Pa. 457, 288 A.2d 762, 764 (1972): "[W]ell-recognized exceptions to the hearsay rule supported by circumstances guaranteeing sufficient 'indicia of reliability' do not raise confrontation problems."

*California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote citation omitted).

¶ 16 In *Commonwealth v. McCloud,* 457 Pa. 310, 322 A.2d 653 (1974), our Supreme Court further explained a criminal defendant's right to confront and cross-examine witnesses in the context of the Pennsylvania Constitution:

> The Pennsylvania Constitution guarantees an accused the right to confront and cross-examine witnesses. Pa. Const. art. I, § 9. Although a fundamental right, this right of confrontation is not absolute. In certain circumstances, the admission of hearsay evidence does not violate the constitutional guarantee; in others, its introduction is constitutionally repugnant. But this divergence in our holdings is no more than a recognition of the principle that 'there are clearly different kinds of hearsay testimony possessed of varying degrees of prejudice.' In delineating the line between admissible and inadmissible hearsay in a criminal case, it is therefore necessary to assess the purpose of the proffered evidence and the risks inherent in its admission.

*Id.* at 655 (case citations omitted).

¶ 17 Moreover, although the hearsay rule and the constitutional right of confrontation overlap, they do not completely overlap, and the confrontation clause is not merely a codification of the rules of hearsay and their exceptions. *See Thomas,* 279 A.2d at 23. In other words, our Supreme Court has

> more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. . . . The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic con-

clusion that confrontation rights have been denied.

*Id.* (quoting *California v. Green,* 399 U.S. at 155–156, 90 S.Ct. 1930 (footnote and citations omitted)). "Thus, the constitutional right to confrontation does not prohibit the introduction of hearsay evidence in all cases." *Id.*

¶ 18 For example, in assessing the nature of the hearsay evidence presented in *Thomas,* which was admitted to establish the relationship between the defendant and his victim, our Supreme Court concluded that the evidence was not so "damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, whatever [curative] instructions the trial judge might give." *Thomas,* 279 A.2d at 24 (quoting *Bruton v. United States,* 391 U.S. 123, 138, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (concurring opinion)). In combination with the fact that the declarant was unavailable, and that other evidence also established the nature of defendant's relationship with the victim, the Court concluded that no constitutional violation occurred. *Id.* at 25. The Court explained that the hearsay evidence was not "crucial" or "devastating" such as, for example, a confession obtained through police coercion. *Id.* at 24.

¶ 19 Another example of a harmless error analysis appears in *Kennedy.* Although the Tennessee Court of Criminal Appeals concluded that the lab report indicating the presence of drugs was not admissible under the business records exception, the court, nevertheless, further concluded that no reversible error in admitting the report occurred because (1) the lab supervisor who had direct participation in checking the forensic scientist's (*i.e.,* the person who performed the testing) findings testified as an expert and was therefore subject to cross examina-

tion, and (2) the applicable rules of evidence indicated that "an expert may base an opinion upon clearly inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation." *Kennedy*, 7 S.W.3d at 66, 67 n. 8. However, the critical difference between the instant case and *Kennedy* is that, in *Kennedy*, the actual lab report was not admitted; rather, the results of the report came in through the testimony of the lab supervisor, who was proffered as an expert witness and who had a close connection to the testing such that "the defense was able to thoroughly cross-examine [him] as to the samples, procedures, safeguards, and results reached" in the particular case. *Id.* at 67.

¶ 20 Similarly, in *Williams*, the Supreme Court of Wisconsin concluded that admission of a lab report identifying illicit drugs did not fall within the business records exception. *Williams*, 644 N.W.2d at 929. The Court indicated, however:

Various courts have concluded that under certain circumstances the right of confrontation may be satisfied by the admission of expert testimony based upon lab test results even where the actual tester is not also present to testify. ***In each case, the testifying expert was highly qualified and had a close connection with the testing in the case such that the expert's presence at trial satisfied the defendant's rights to confront and cross-examine.***

*Id.* at 925 (citations omitted, emphasis added). However, the court stated that although it is acceptable for an expert to rely upon inadmissible hearsay evidence to establish his own opinion, "[t]he right to confrontation is not satisfied when the government produces a witness who does nothing but summarize out-of-court statements and opinions made by others." *Williams*, 644 N.W.2d at 926 (citing *United States v. Lawson*, 653 F.2d 299, 302 (7th Cir.1981)).

¶ 21 Contrastingly, in *McCloud*, our Supreme Court was faced with the question of whether a murder defendant's right to confrontation and cross-examination was violated when the Commonwealth read into evidence, over repeated objection, substantial portions of the medical examiner's autopsy report, which rendered an opinion about the victim's cause of death. The medical examiner was not present to testify at trial. In addressing this issue, the Court indicated that, to delineate admissible hearsay from inadmissible hearsay, it would have to "assess the purpose of the proffered evidence and the risks inherent in its admission." *McCloud*, 322 A.2d at 655. The Court began its analysis by stating:

Causation is an element of the crime of murder and must be proved beyond a reasonable doubt by the Commonwealth in every homicide prosecution. Frequently, the cause of death is seriously in issue and the subject of conflicting opinion by qualified physicians. This is not surprising, because the legal cause of death is at best a conclusion based on interpretation of often conflicting medical opinion.

*Id.* (citations omitted). The Court also said:

'(a)n opinion expressed in hospital records (were they to be admitted without the presence of the physician) is subject to no such searching inquiry as to accuracy, soundness, and veracity. Hence the danger in admitting them is very great. However admirable, whatever the character and reputation of the institution from which records come, to deny a defendant the opportunity to test the correctness of the diagnosis and ascertain the qualifications of the assertor ... is to deny (him) a substantial right.'

*Id.* at 656 (quoting *Paxos v. Jarka Corp.,* 314 Pa. 148, 171 A. 468, 471 (1934)). Conversely, where hospital records are admitted to establish the *fact* of hospitalization and the *fact* of treatment given, and were not admitted to show a medical opinion, the record was properly admitted as a business records exception to the hearsay rule. *Id.* (citing *Commonwealth v. Mobley,* 450 Pa. 431, 301 A.2d 622, 624 (1973)). The *McCloud* Court reiterated that "the purpose of offered evidence can determine its admissibility with respect to the confrontation clause." *Id.*

It appears from the various decisions that the admissibility in evidence of business records depends upon the purpose for which they are offered. *If they are offered to prove an essential element of the crime* or connect the defendant directly to the commission of the crime, *then they must be proved through persons having personal knowledge of the element or connection and such persons must be available to testify for cross-examination.* If, instead of producing the person who has personal knowledge, the state relies on documents made by such person [ . . . ], the defendant has been denied his right to confront the witnesses against him.

*Id.* (quoting *State v. Matousek,* 287 Minn. 344, 178 N.W.2d 604, 608 (1970)) (emphasis added). The *McCloud* Court concluded that the portions of the autopsy report read into the record constituted opinion evidence and, thus, it would have been necessary to call the medical examiner who conducted the autopsy and wrote the report as a witness so that his opinions and conclusions could be tested by cross-examination. *Id.* If the medical examiner had been present to testify, the defense "would have been able to submit the reliability of the examiner's opinion to the jury's scrutiny. Any weakness could have

been unearthed." *Id.* The report could get admitted, without the medical examiner present to testify, if, for example, it was admitted to show the fact of the decedent's death or establish the fact that an autopsy was performed. *Id.* However, use of the autopsy report to establish the cause of death (which is an element of the crime of murder) "denied appellant the fundamental constitutional right of confrontation and was error." *Id.* The Court succinctly set forth its holding: "[I]n a homicide prosecution, evidentiary use, as a business records exception to the hearsay rule, of an autopsy report in proving legal causation is impermissible unless the accused is afforded the opportunity to confront and cross-examine the medical examiner who performed the autopsy, absent a compelling necessity." *Id.* at 656–57.

■ ¶ 22 Keeping in mind these examples of cases involving a harmless error analysis, we now turn to the record in the instant case. At trial, the Commonwealth called Mr. Reigle to testify with regard to the lab report. As previously noted, Mr. Reigle is the crime laboratory manager of the Harrisburg Regional Lab of the Pennsylvania State Police. N.T. Trial, 1/11–12/99, at 69. At the time of trial, Mr. Reigle had been employed in that position for approximately six years. *Id.* at 69–70. Prior to taking the position as manager, Mr. Reigle had extensive experience as a forensic scientist and forensic scientist supervisor. *Id.* at 70. He claimed to have performed "tens of thousands" of the types of analyses at issue in the instant case. *Id.* Since the trial court allowed the Commonwealth to admit the report under the business records exception, the Commonwealth's direct examination of Mr. Reigle consisted, *inter alia,* of his role as custodian of the lab reports. *Id.* Thus, Mr. Reigle described how reports are generated, *i.e.,* by computers, based on informa-

tion inputted by the scientist performing the tests. *Id.* He indicated that a report is generated shortly after the tests are completed on a substance. *Id.* The file for each case that comes into the laboratory contains, in addition to the lab report, the request for the laboratory analysis, the notes, if any, of the scientist who performed the tests and any other data generated during the analysis. *Id.* at 71. Mr. Reigle also testified to the manner in which the records in the crime lab are organized and stored. *Id.* When asked by the Commonwealth if he had any personal knowledge of the notes and records generated by the laboratory scientists performing the analyses, he stated: "Yes. From time to time when the supervisors, who are the immediate supervisor [sic] of the analyst, they review the reports. But from time to time when they aren't there, I review the reports, too." *Id.* However, he later admitted that he had only reviewed the documents in the laboratory file pertaining to this case the morning before his in-court testimony. *Id.* at 79 ("[T]he first time I reviewed them was today."). He stated that the records are made in the regular course of the crime lab's business. *Id.* at 71. The Commonwealth then moved for admission of the lab report, and other associated documents from the lab's file, pursuant to the business records exception. *Id.* at 75. The trial court permitted the admission into evidence based on the business records exception. *Id.* at 76. The Commonwealth then presented a copy of the lab report at issue herein to Mr. Reigle, and he essentially read out loud from the report, conveying information which included, *inter alia,* the name of the accused, the incident number, when the evidence was received into the lab, and, most relevant to this appeal, the results of the analysis performed, which indicated that cocaine was present. *Id.* at 76–77. He was also able to testify, for example, about the chain of custody in this case based only on the information contained in the report and not by any personal observation of the substance. *Id.* at 78, 80. Mr. Reigle did no testing of the substance himself, and there was no evidence that he even observed the testing or the substance to any degree. Instead, he simply paraphrased the report and concluded that the testing was done in compliance with the lab's ordinary procedures. *Id.* at 80.

¶ 23 It is readily apparent from Mr. Reigle's testimony that he did not have the "close connection" to the testing that the witnesses in *Kennedy* and *Williams* had to the testing in those cases. *See Kennedy,* 7 S.W.3d at 66, 67 n. 8; *Williams,* 644 N.W.2d at 925. It is also apparent that the lab report, in combination with Mr. Reigle's testimony, constituted the only substantive evidence to establish the presence of an illicit substance. In this regard, we recall that evidence "offered to prove an essential element of the crime … must be proved through persons having personal knowledge of the element or connection and such persons must be available for cross-examination." *McCloud,* 322 A.2d at 656. Only the forensic scientist who performed the test, Mr. Kozlusky, had the personal knowledge of the tests he performed in this case.

■ ¶ 24 Moreover, the Commonwealth did not attempt to certify Mr. Reigle as an expert. However, even if we characterize his testimony as expert testimony, we find that Mr. Reigle merely recited the results of the test as indicated in the report (or, basically, just read the report), rather than enunciating his own opinion developed upon his review of the file. It is fundamental that an expert cannot merely echo another person's opinion as contained in a report prepared by that other person. *See Woodard v. Chatterjee,*

827 A.2d 433, 444 (Pa.Super.2003) (indicating that, although it is fine for an expert to rely on sources customarily relied upon in his profession to develop his own opinion, it is not acceptable for an expert to act as a "mere conduit or transmitter of the content of an extrajudicial source"). Indeed,

[a]n "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination. The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where ... the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience, we conclude that the expert's testimony should be permitted.

*Id.* at 444–45 (citation omitted). In the instant case, even if the Commonwealth had proffered Mr. Reigle as an expert, his testimony would have nevertheless been unacceptable as it merely echoed the data and results contained in the lab report, which he did not prepare. Moreover, if Mr. Reigle had testified as an expert, the lab report itself would remain inadmissible hearsay, although as an expert, Mr. Reigle would have been entitled to rely upon it in formulating his opinion.

¶ 25 In summary, we conclude that Appellant's constitutional right to confrontation was violated when the court admitted the lab report without the testimony of the forensic scientist who performed the me-

chanics of the testing and prepared the report. We base this conclusion on the following reasons, described above and summarized here: (1) Mr. Reigle was not proffered as an expert but, rather, was proffered and colloquied as a custodian of business records of the lab because the Commonwealth proceeded on the erroneous assumption that the report was properly admitted as a business record; (2) even if Mr. Reigle had been proffered as an expert, the entire substance of his testimony was merely a repetition of the information in the lab report, and the lab report would have remained inadmissible hearsay despite the fact that, as an expert, Mr. Reigle would have been entitled to rely upon it in formulating his own opinion; (3) Mr. Reigle did not have the "close connection" to the actual testing like the witnesses did in *Kennedy* and *Williams,* such that admission of the lab report could be deemed harmless error; and (4) the information in the erroneously admitted report was the only evidence of record establishing an essential element of the drug offenses herein, *i.e.,* the presence of cocaine, and therefore, pursuant to *McCloud,* required a witness with personal knowledge of the testing.

¶ 26 Finally, we note that we have no information of record that would tell us about the accuracy or rate of error of the specific tests performed here (which themselves were not even elucidated to by Mr. Reigle in his testimony), or about the subjectivity involved in reading the results of tests. Therefore, we cannot conclude, on this record, that the report has the indicia of reliability inherent in other documents that come within the business records exception. However, even if we had information about the specific tests and how the results of the tests are obtained, and even if that information revealed indicia of reliability, the fact would remain that the tests were performed in a lab under the aegis of

the Pennsylvania State Police for the principal purpose of prosecution. We recognize that scientists, as a general matter, base their conclusions on empirical evidence and ascribe to the scientific method; however, that does not change the fact that there is a possible inherent bias as the lab is part of the Pennsylvania State Police.[6]

¶ 27 For the foregoing reasons, we find that appellate counsel was ineffective for failing to raise the issue pertaining to the lab report on direct appeal. Indeed, we can see no reasonable basis for counsel's failure to raise this meritorious issue, which resulted in the prejudicial admission of the lab report—evidence that certainly contributed to the verdict in this case. Accordingly, we reverse the order denying PCRA relief and remand this case for a new trial.

¶ 28 Order reversed. Case remanded for a new trial. Jurisdiction relinquished.

¶ 29 Judge JOYCE files a Dissenting Opinion in which GANTMAN and McCAFFERY, JJ. join.

DISSENTING OPINION BY JOYCE, J.:

¶ 1 I most respectfully dissent from the majority's conclusion that the crime lab report was inadmissible as substantive evidence.[7] In my view, the trial court prop-

---

**6.** We also recognize, however, that some commentators have questioned the reliability of crime lab tests and results. Indeed, according to these sources, crime lab reports are not so inherently infallible or trustworthy such that they should be permitted to be automatically accepted as fact without question by the parties or the courts. *See, e.g.,* Office of the Inspector General, Department of Justice, *The FBI Laboratory: An Investigation into FBI Laboratory Practices and Alleged Misconduct in Explosives–Related and Other Cases* (April 1997), *available at* http://www.usdoj.gov/oig/special/9704a/; Ruth Teichroeb, *State Patrol fires crime lab scientist,* Seattle Post-Intelligencer, March 24, 2004 (describing firing of crime lab scientist from Washington state police crime lab for, *inter alia,* "sloppy work"); Leslie A. Pappas, *Crime labs follow strict rules, but scientists can make errors,* Philadelphia Inquirer, July 18, 2003 (describing element of human error in crime labs); Philadelphia Inquirer, *Pa. Crime-lab Scientist's Errors Prompt Alert to 27 Counties* (June 19, 2003); Roman Khanna and Steve McVicker, *Police Chief Shakes up Crime Lab— 2 Officials Quit, Others Disciplined,* Houston Chron., June 13, 2003 (describing audit findings of "shoddy science, an undertrained staff and conditions ripe for contamination" in Houston police department crime lab and describing specific derelictions of various individual forensic scientists); Rene Stutzman, *Crime-lab Worker Puts Cases in Doubt,* Orlando Sentinel, July 19, 2002; *Errors at F.B.I.*

*May Be Issue In 3,000 Cases,* New York Times, March 17, 2003, at A17 (describing Justice Department identification of "about 3,000 criminal cases that could have been affected by flawed procedures and skewed testimony by F.B.I. laboratory technicians before 1997"). *See also, e.g., State of West Virginia v. Zain,* 207 W.Va. 54, 528 S.E.2d 748 (1999) (describing misconduct of former serologist in the West Virginia Department of Public Safety Crime Laboratory).

The purpose of this footnote is merely to cite examples from around the country that cause us to reflect on the possibility of human error and its negative effects on the accuracy and reliability of scientific test results. However, we want to make absolutely clear that we do not have any reason to believe that the forensic scientists who work in the crime lab at issue in the instant case are anything other than knowledgeable professionals who faithfully ascribe to well-accepted scientific standards and who take their important jobs very seriously.

**7.** The Commonwealth offered, and the trial court admitted, two exhibits pertaining to the nature and weight of the substance seized from Appellant. Neither of the exhibits has been transmitted to this Court, however the contents of each exhibit are clearly described in the record. Commonwealth's Exhibit No. 4 was a copy of the lab report, number H9801978–C, prepared and signed by the chemist. N.T. Nonjury Trial & Sentencing,

erly admitted the report as a record of regularly conducted activity under Pa.R.E. 803(6) (the "business record exception" to the hearsay rule). I would therefore reject Appellant's claim that original appellate counsel was ineffective for failing to appeal this issue and affirm the order of the PCRA court denying relief.

¶ 2 The trial court determined that the Commonwealth had satisfied the requirements of Rule 803(6). I agree. First, the rule expressly allows for the admission of a business record "even though the declarant is available as a witness." *Id.* Thus, the availability of the chemist who actually prepared the lab report is immaterial. In any event, Mr. Reigle, the manager of the crime lab and supervisor of the chemists, testified at length regarding his knowledge of the testing procedures employed by the lab. N.T. Nonjury Trial & Sentencing, January 11–12, 1999, at 69–71. Mr. Reigle verified that the lab report in this case was generated by the chemist at or near the time that the chemist conducted the scientific analysis of the substance recovered from Appellant's person. *Id.* at 70:14–23, 74:16–75:2. Mr. Reigle indicated that it is the regular business practice of the crime laboratory to generate such reports. *Id.* at 71:19–22. I also agree with the trial court's observation that "there's little or no motive here for inaccurate information or inappropriate information. These are routine records." *Id.* at 76:13–15. Indeed, Appellant has pointed to nothing in the record to suggest a "lack of trustworthiness" in the sources of information or other circumstances behind the creation of the report.[8] In light of the foregoing, the trial court committed no abuse of discretion when it determined that Mr. Reigle was a custodian or other qualified witness and admitted the lab report as a business record through his testimony.

¶ 3 As indicated above, no confrontation problems are raised in this case since the lab report was admitted under a well-recognized exception to the hearsay rule and supported by sufficient indicia of reliability. *Romero, supra.* That notwithstanding, the majority proceeds with a constitutional analysis and concludes that the trial court, by admitting the lab report, violated Appellant's right to confront and cross-examine the chemist. In reaching that conclusion the majority cites to *Commonwealth v. McCloud,* 457 Pa. 310, 322 A.2d 653 (1974). In *McCloud,* our Supreme Court held that opinions, diagnoses and conclusions contained in hospital or medical records are not admissible under the business records exception. *See also* Pa. R.E. 803(6), Comment (noting that, consistent with prior Pennsylvania case law, Rule 803(6) does not include opinions and diagnoses). The rationale for excluding such evidence is that it is the equivalent of expert testimony and, therefore, not admissible unless the individual who prepared the report is available for cross-examination regarding the accuracy, relia-

January 11–12, 1999, at 72:13–15. Commonwealth's Exhibit No. 5 contained copies of the documents in the original case file which the chemist prepared and relied upon in generating the actual lab report. *Id.* at 74–75. Appellant challenges only the admission of Commonwealth's Exhibit No. 4, the actual lab report.

8. In contrasting Pa.R.E. 803(6) with its precursor, the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108(b), the drafters of the rule state that "Pa.R.E. 803(6) places the burden on *an opposing party* to show that the sources of information or other circumstances indicate that a business record is untrustworthy, and thus does not qualify for exception to the hearsay rule. The statute places the burden on the proponent of the evidence to show circumstantial trustworthiness." Pa.R.E. 803(6), Comment. Thus, under Rule 803(6), the burden was clearly on Appellant to demonstrate how the lab report was untrustworthy.

bility and veracity of his or her opinion. *Id.* at 655. It is significant that *McCloud* was a homicide case since, as the Court observed, "the legal cause of death is at best a conclusion based on interpretation of often conflicting medical opinion." *Id.*

¶ 4 In my view, *McCloud's* proscription on opinion evidence is really the exception to the rule that "[h]ospital records are generally admitted at trial as an exception to the hearsay rule under the [business records exception]." *Commonwealth v. Seville*, 266 Pa.Super. 587, 405 A.2d 1262, 1264 (1979). In *Seville*, this Court held that a hospital report containing results of a blood alcohol test was admissible as a business record even though the hospital technician who administered the test was not present at trial. In distinguishing *McCloud*, we stated that "[n]o such doubts as to reliability and accuracy are entertained when a record is offered merely to prove facts, such as the event of hospitalization, treatment prescribed, symptoms given, *or the existence of some readily ascertained substance or chemical within the body*." *Id.* (emphasis added). This Court went on to conclude that

> [t]here is nothing in this record or in the pertinent authorities which would suggest the result of a blood alcohol test is a matter "seriously in issue and the subject of conflicting opinion by qualified physicians." Rather, we are persuaded the test is in the realm of medical fact. Courts and legislatures have now accepted the blood test as "undeniably accurate" and we will not burden the Commonwealth with producing witnesses to establish a fact which experience has proven to be trustworthy.

*Id.* at 1265–1266 (quoting *McCloud*) (footnoted omitted).

¶ 5 Subsequent cases involving the admission of blood alcohol test results have focused on the distinction between fact and opinion identified in *Seville.* For example,

in *Commonwealth v. Karch*, 349 Pa.Super. 227, 502 A.2d 1359 (1986), appellant, following his conviction for driving under the influence of alcohol, argued that the results of his blood alcohol test were inadmissible unless the technician who performed the test was called to testify. *Id.* at 1360. This Court rejected Karch's argument based upon the following analysis:

> In the case at bar, as in *Commonwealth v. Seville, supra,* the physician who set the protocol for such laboratory procedures explained the blood test results of appellant, even though he was not present when the test was performed. The physician explained that he received and retained the records relative to the test performed, identified the lab and equipment used, and described the technician who performed the test as qualified with more than thirty years of experience. Based upon the logic espoused in the *Seville* case, nothing more is required for the admissibility of the blood-alcohol test results.

*Karch*, 502 A.2d at 1361.

¶ 6 Similarly, in *Commonwealth v. Kravontka*, 384 Pa.Super. 346, 558 A.2d 865, 866 (1989), we were confronted with an issue directly analogous to that articulated by the majority: whether admission of blood alcohol test results, pursuant to the business records exception to the hearsay rule and without the presence of the lab technician who performed the blood analysis, violate a defendant's Sixth Amendment right of confrontation. In answering that question in the negative, Judge Popovich, writing for the majority, first noted that

> [w]hen we review a constitutional objection to admission of evidence pursuant to an exception of the hearsay rule, we must remember that, although the right of confrontation is a fundamental right, it "must occasionally give way to considerations of public policy and the necessities of the case."

*Id.* at 868 (quoting *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895)). Judge Popovich framed the analysis further by stating

"[t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay." *Ohio v. Roberts,* 448 U.S. [56,] 65, 100 S.Ct. [2531,] 2538, [65 L.Ed.2d 597 (1980) ]. First, "[i]n the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. (Citations omitted)." *Id.,* 448 U.S. at 65, 100 S.Ct. at 2538."

However, a demonstration of unavailability is not always required. In *Dutton v. Evans,* [400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) ], for example, the Supreme Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness. *Ohio v. Roberts,* 448 U.S. at 66 n. 7, 100 S.Ct. at 2538 n. 7.

*Kravontka,* 558 A.2d at 868. The *Kravontka* court reasoned that the type of exception to the hearsay rule at issue was precisely the type that would not require the production of the declarant. Citing *Seville* and *Karch,* the Court concluded that

[b]ecause of the overwhelming "indicia of reliability" inherent in blood-alcohol tests and the records of those test[s], the cross-examination of the technician who performed the test would be of insignificant utility to a defendant. Moreover, we see little need to parade before a jury every technician who was associated with a defendant's blood-alcohol test simply to explain a procedure which, on a daily basis, is proven most reliable.

*Id.* at 870. *Cf. Commonwealth v. Campbell,* 244 Pa.Super. 505, 368 A.2d 1299 (1976) (hospital records, showing existence of spermatozoa in rape victim, held properly admitted as fact via medical records librarian); *Commonwealth v. Xiong,* 428 Pa.Super. 136, 630 A.2d 446 (1993) (notation on physician's report that victim had "no hymen" was factual assertion, rather than diagnosis or opinion, admissible under business record exception); *Commonwealth v. Nieves,* 399 Pa.Super. 277, 582 A.2d 341 (1990) (finding standard gonorrhea tests sufficiently similar to spermatozoa and blood alcohol tests to warrant admission of test results under business record exception).

¶ 7 I find the cases discussed above to be directly analogous to the case *sub judice.* The lab report admitted against Appellant, unlike the coroner's report in *McCloud,* did not offer the "opinion or diagnosis" of its author. Like the blood-alcohol test results admitted in *Seville, Karch,* and *Kravontka,* the report at issue here contained objective facts related to the nature and weight of a readily ascertained substance (cocaine) in a controlled sample. The test performed by the chemist, and described by Mr. Reigle, is an accepted chemical analysis that produces highly reliable results rising beyond mere opinion to the level of scientific fact. The elements of trustworthiness inherent in this type of scientific analysis "serv[e] in place of the safeguards ordinarily afforded by confrontation and cross-examination[.]" *Seville,* 405 A.2d at 1265.

¶ 8 Moreover, even the fundamental constitutional right of confrontation must bow to considerations of public policy and the necessities of a case where the utility of confrontation is, as it is here, remote. *Kravontka, supra.* The chemists who conduct analyses of controlled substances do so routinely and generally do not have an interest in the outcome of a trial. As

scientists, they are under a duty to make accurate reports and it is difficult to perceive any motive or opportunity for the chemist to falsify such reports. It also seems to me highly unlikely that the chemist in this case would have remembered any pertinent details regarding a chemical analysis he performed nearly one year before Appellant's trial. His testimony inevitably would have been based on the lab report now at issue. Furthermore, any relevant testimony bearing on the likelihood of error in the testing procedure necessarily would have involved broad statements as to general practices and probabilities within the laboratory, all matters about which Mr. Reigle was certainly qualified to testify.

¶ 9 In conclusion, and to paraphrase this Court's astute observation in *Kravontka, supra,* I see little need to parade before a jury every technician who was associated with a chemical test to explain a procedure which, on a daily basis, is proven most reliable. Since the trial court properly admitted the crime lab report, Appellant's present ineffective assistance claim is premised upon a meritless issue. I would affirm the order dismissing Appellant's PCRA petition without a hearing.[9]

In re: B.S.

---

**9.** Appellant raises two additional issues on appeal. He first contends that appellate counsel was ineffective for failing to appeal the trial court's denial of his motion for a continuance of his trial, which Appellant made for the purpose of retaining new counsel. I would find no merit to Appellant's underlying argument since he failed to comply with the 48–hour deadline imposed by Pa.R.Crim.P. 106 (Continuances in Summary and Court Cases). Moreover, under the facts of this case, the need for swift and efficient administration of criminal justice outweighed Appellant's right to assert a purely dilatory motion for a continuance. Appellant also ar-gues that appellate counsel was ineffective for failing to challenge trial counsel's performance with respect to the admission of certain testimonial evidence regarding prior drug convictions. In light of the overwhelming evidence offered against Appellant, including the crime lab report I deem admissible for the reasons set forth in text, I would find that Appellant could have suffered no prejudice as a result of trial counsel's allegedly ineffective assistance. Based upon the foregoing, I would find that appellate counsel was not ineffective for failing to pursue the claims asserted by Appellant and would affirm the PCRA court's denial of relief.