**Hansen v. Wyeth Inc.**

502

*Robert E. Curran,* for plaintiffs.

*Michael T. Scott, Barbara R. Binis* and *Louis W. Schack,* for defendants.

BERNSTEIN, *J.,* October 10, 2005—The above captioned cases were tried together before a jury beginning

on September 28, 2004. Each plaintiff claimed defendant Wyeth failed to respond to a "signal" that Pondimin causes valvular regurgitation. Each plaintiff claimed that as a result of this failure, defendant failed to warn their prescribing physician of this risk, resulting in injury. On November 3, 2004, the jury rendered a verdict against defendant Wyeth and for plaintiffs Mildred Hill in the amount of $395,000; Joyce Jensen in the amount of $560,000; and Lucy Hansen in the amount of $400,000. Timely post-verdict motions were filed. By order dated May 10, 2005, this court granted defendants' post verdict motions and a new trial as to liability only was granted. From the order plaintiffs timely appealed. Defendants filed a cross-appeal.

For the reasons set forth below, the decision of the court should be affirmed.

Effective October 1, 1998, the Pennsylvania Supreme Court codified the Rules of Evidence. In that code the Supreme Court expanded the scope of expert testimony in some respects and in other respects restated traditional Pennsylvania safeguards against the trial of fact deteriorating into a battle of experts. Even rules which parallel or were adopted from the Federal Rules of Evidence verbatim do not require that Pennsylvania courts follow federal court interpretation. For example, Pennsylvania Rule of Evidence 703 is verbatim the Federal Rule of Evidence 703 as it existed at the time of codification, yet its adoption did not transform Pennsylvania into a "Daubert" state.[1] The Pennsylvania Supreme Court has continuously held that evaluation of expert testimony must be per-

---

1. See for example *Grady v. Frito-Lay,* 576 Pa. 546, 839 A.2d 1038 (2003).

formed in accordance with the "Frye" standard of admissibility. Other codified Rules have no parallel in the Federal Rules of Evidence because they are grounded in Pennsylvania's traditional common-law approach to expert opinion testimony. Rule 705 of the Pennsylvania Rules of Evidence has no counterpart in the Federal Rules. This rule reads:

"Disclosure of facts or data underlying expert opinion.

"The expert may testify in terms of opinion or inference and give reasons therefore; however the expert must testify as to the facts or data on which the opinion or inference is based."[2]

The comment to Rule 705 authored by the Committee on the Rules of Evidence, while not officially adopted, accurately describes the difference between longstanding Pennsylvania jurisprudence and the federal approach: The Federal Rule generally does not require an expert witness to disclose the facts upon which an opinion is based prior to expressing the opinion. Instead the cross-examiner bears the burden of probing the basis of the opinion. Pennsylvania does not follow the Federal Rule. See *Kozak v. Struth,* 515 Pa. 554, 560, 531 A.2d 420, 423 (1987). In *Kozak v. Struth,* the Pennsylvania Supreme Court was specifically asked to adopt the Federal Rule approach. The Supreme Court squarely and specifically rejected the invitation. The Supreme Court said: "requir-

---

2. Federal Rule 705 reads quite to the contrary: "The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

ing the proponent of an expert opinion to clarify for a jury the assumptions upon which the opinion is based avoids planting in the juror's mind a general statement likely to remain with him in a jury room when the disputed details are lost." The Evidence Committee's annotation further explains: "Accordingly, *Kozak* requires disclosure of the facts used by the expert in forming an opinion. The disclosure can be accomplished in several ways. One way is to ask the expert to assume the truth of testimony the expert has heard or read. . . . Another option is to pose a hypothetical question to the expert. . . ." The comment continues with the salutary purpose of the rule: "The salient facts relied upon as the basis of the expert opinion must be in the record so that the jury may evaluate the opinion. See *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988)."

Thus, although an expert may utilize material routinely relied upon in the exercise of her profession outside of the courtroom to formulate an opinion,[3] and may also rely on facts or data learned outside of the courtroom to formulate an opinion,[4] the case-specific factual basis upon which that opinion is based must be presented to the jury in direct examination. As the official comment succinctly explains, the rule is needed to preclude an expert from becoming a thirteenth super-juror: "The salient facts must be in the record so the jury can factually evaluate the basis of expert opinion."

If the material and important facts on which an expert's opinion is based differ from the jury's own findings of fact, then the jury can and obviously should reject that

---

3. See Pa.R.E. 703.
4. See Pa.R.E. 703.

opinion. Thus, Rule 705 requires that the jury in direct examination be provided with testimony essential to evaluate the factual basis upon which an expert's opinion is grounded. Rule 705 properly imposes a dual burden on the proponent of opinion evidence, first, to present in direct examination the complete factual foundation and basis for the opinion testimony, and secondly, to demonstrate that this basis is independently supported by facts of record.

In adopting Rule 705 the Supreme Court reaffirmed Pennsylvania jurisprudence of opinion evidence dating back to 1909[5] and repeatedly reaffirmed thereafter.[6] This tradition was profoundly articulated by the Supreme Court in *Kozak v. Struth*.[7] In that case the Supreme Court analyzed the differences between Pennsylvania and federal procedure. The Supreme Court recognized that the Federal Rule is based on the belief that "the proponent's adversary can protect his client by competent cross-examination exploring facts or data underlying the [expert] opinion." Rejecting this approach, the Supreme Court

---

5. See *Gillman v. Media, Middletow, Aston & Chester Electric Railway Co.*, 224 Pa. 267, 73 A. 342 (1909).

6. See *Collins v. Hand*, 431 Pa. 378, 387, 246 A.2d 398, 404 (1968) (requiring factual foundation for expert opinion); *Rose v. Hoover*, 231 Pa. Super. 251, 254, 331 A.2d 878, 880 (1974); *Foster v. McKeesport Hospital*, 260 Pa. Super. 485, 490, 394 A.2d 1031, 1033 (1978); *Kozak v. Struth*, 515 Pa. 554, 561, 531 A.2d 420, 422-23 (1987); *Capan v. Divine Providence Hospital*, 270 Pa. Super. 127, 139, 410 A.2d 1282, 1286-87 (1979); *Commonwealth v. Rounds*, 518 Pa. 204, 209, 542 A.2d 997, 999 (1988) (failure to provide factual basis for expert's opinion usurps jury function); *Yanto v. Workmen's Compensation Appeal Bd.*, 128 Pa. Commw. 231, 237, 563 A.2d 232, 235 (1989); *Primavera v. Celotex Corp.*, 415 Pa. Super. 41, 51, 608 A.2d 515, 521 (1992); *Starr v. Veneziano*, 560 Pa. 650, 747 A.2d 867 (2000).

7. *Kozak v. Struth*, 515 Pa 554, 531 A.2d 420 (1987).

said: "relying on cross-examination to illuminate the underlying assumptions may further confuse jurors already struggling to follow complex testimony. Additionally, total reliance on cross-examination permits the party propounding the expert evidence to introduce it generally in a conclusory manner without relation to the record and cast the whole burden of disqualifying it on the opponent. This is contrary to the usual practice of allocating to the proponent of evidence, as the party with the laboring or the duty of laying a logically understandable foundation." [8] Reliance on cross-examination also detrimentally requires the opponent to reiterate the opinion she is trying to discredit.

While most rules of evidence concern the admission of facts, Rule 705 concerns itself not with admission but disclosure. Absent a clear disclosure of the factual basis of opinion testimony, an expert's opinion does not so much assist the jury with their determination of the facts as replace the jury's essential fact-finding role.[9] Without a clear disclosure, the jury has no basis for determining whether the facts as understood or assumed by the expert are compatible with the facts as the jury finds them to be. Thus, Rule 705 was adopted to preserve the exclusive fact-finding function of the jury.

While elevated in importance by codification, Rule 705 is not new, merely a new formulation of traditional concepts. Prior to codification, Pennsylvania law avoided a battle of experts by requiring the case-specific factual ba-

---

8. *Kozak,* 515 Pa. at 560, 531 A.2d at 423 (1987).

9. Rule 702 requires that expert testimony assist the jury. The trial court has been repeatedly admonished by our appellate courts to appropriately act as gatekeeper and preclude opinion evidence which does not assist the jury.

sis of expert opinion be both explained and independently proven. Thus, the jury could readily evaluate the basis of any opinions expressed against their own factual findings.

Once independent proof became no longer required because Rule 703 as adopted universalized a previously limited exception permitting experts to testify based on facts and data not independently proven at trial, a specifically articulated Rule 705 became essential. The fact-finding role of the jury, which could become blurred by never having the factual basis independently proven by other witnesses, could become hopelessly obscured if the case-specific factual basis for the opinion also remained hidden by the expert. Rule 705 is the solution to this problem. Rule 705 requires that the jury clearly learn the factual basis of opinion evidence from the expert herself on direct examination.

Disclosure is essential to the fact-finding function of the jury, explained the Supreme Court in *Commonwealth v. Rounds,* 518 Pa. 204, 209, 542 A.2d 997, 999 (1988): "If a jury disbelieves the facts upon which the opinion is based, the jury undoubtedly will disregard the expert's opinion. Likewise, if a jury accepts the veracity of the facts which the expert relies upon, it is more likely that the jury will accept the expert's opinion. At the heart of any analysis is the veracity of the facts upon which the conclusion is based. Without the facts, a jury cannot make any determination as to validity of the expert's opinion. To hold otherwise would result in a total and complete usurpation of the jury's function in our system of justice."

In *Rounds,* the Supreme Court reiterated long-standing precepts:

"If the jury accepts the foundation of fact it then decides what credence it will impart to the doctor's rea-

soning and applied medical knowledge built upon that foundation. If the jury detects fissures of undependability in that foundation, then the expert opinion necessarily falls of its own weight." *Kelly v. Martino,* 375 Pa. 244, 246, 99 A.2d 901, 902 (1953).

Standard jury instructions explain to the jury that expert opinion evidence is valid only when the jury accepts the facts upon which it is based.[10] If opinion evidence assumes a fact that the trier of fact finds not to be true, the jury should disregard any such opinion. Likewise, if any opinion assumes or is based upon the conclusion that a fact is not true, and the jury finds that fact to be true, the opinion must also be disregarded. Any other principle permits the professional expert to usurp the fact-finding function. Unless the factual basis can be independently evaluated by the jury, the jury function is necessarily reduced to evaluating the credibility of the expert.[11]

Without an understanding of the case-specific facts on which the expert relied, the jury cannot make any determination as to the validity of the expert's opinion. To allow an expert to obfuscate the factual basis results

---

10. Every jury is charged, as this jury was: "in evaluating the opinion of any expert you should consider the evidence as to training, experience and qualifications which was presented to you together with the information and facts on which the opinion was based. In general, the opinion of an expert has value only when you accept the facts upon which it is based. This is true whether the facts are assumed hypothetically by the expert, or they come from the expert's personal knowledge, from some other proper source, or from some combination of these." Pa. SSJI (Civ) 5.31.

11. Which unfortunately may come down to the effectiveness of the advocacy of the witness or whether jurors prefer a Yale alumni to a Harvard alumni.

in the usurpation of the jury's function and necessarily reduces the trial to a battle of experts. To force the opposing party to explicate an adverse expert's factual basis is unacceptable because it unfairly shifts the burden, particularly when pretrial disclosure is limited,[12] expert depositions are generally prohibited,[13] and the cross-examiner runs the risk of the expert presenting otherwise "inadmissible" information[14] to the jury in an answer.

An expert, once properly qualified, may testify as to opinions or inferences the expert has drawn and must give reasons for that opinion. The facts upon which the testimony is based must not only be articulated in direct examination but must also be in the record. As explained by the Supreme Court in *Commonwealth v. Rounds:*[15] "expert opinion testimony is proper if the facts upon which it is based are of record." Subsequent to adoption of the code, in *Viener v. Jacobs,* 834 A.2d 546 (Pa. Super. 2003) the Superior Court reaffirmed this proposition in holding that a hypothetical question could not ask an expert to assume facts not in evidence. The disclosed basis of opinion testimony presented on direct testimony must still be grounded in and limited to facts "of record" and "there must be some factual predicate for the opinion identified on the record. . . ." *Starr v. Veneziano,* 560 Pa. 650, 663 n.10, 747 A.2d 867, 874 n.10 (2000). In *Viener,* 834 A.2d at 558, the Superior Court said: "It is well settled that expert testimony is incompetent if it lacks an adequate basis in fact. The

---

12. See Pa.R.C.P. 4003.5.

13. See Pa.R.C.P. 4003.5; Pa.R.C.P. 4007.2.

14. See Pa.R.E. 703.

15. *Commonwealth v. Rounds,* 518 Pa. 204, 209, 542 A.2d 997, 999 (1988).

expert is allowed only to assume the truth of testimony already in evidence. *Hussey v. May Department Stores Inc.,* 238 Pa. Super. 431, 357 A.2d 635, 637 (1976). While an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. *Niggel v. Sears, Roebuck and Co.,* 219 Pa. Super. 353, 281 A.2d 718 (1971). This means that expert testimony cannot be based solely upon conjecture or surmise. An expert must do more than guess. His or her assumptions must be based upon such facts as the jury would be warranted in finding from the evidence. *Houston v. Canon Bowl Inc.,* 443 Pa. 383, 278 A.2d 908 (1971)."

While Pa.R.E. 705 requires that the facts or data underlying an expert opinion be disclosed during the expert's direct testimony, it does not specify the method by which such disclosure should take place. Where the expert witness reached an opinion or drew an inference based in whole or in part upon facts within the expert's personal knowledge, Pa.R.E. 705 requires that the witness testify to those facts on direct examination. Where the expert has obtained facts from a review of the litigation record, such as, deposition, documents, or exhibits, the expert may simply identify the case-specific facts of record on which the opinion is based. He may not, however, obscure his factual predicate by merely identifying volumes of depositions, reports, literature and records from which he has drawn the facts.

The Rule 705 requirement of presenting the "facts and data" which form the basis of the opinion may not be satisfied by a mere formalistic recitation of the material reviewed or considered. That pro forma routine absolutely obscures what Rule 705 intends to clarify and is

tantamount to the clearly impermissible tactic of offering an opinion based on "all the evidence."[16]

If Rule 705 is complied with, even opinion based upon equivocal data may be admissible after the factual basis has been fully explained. In *Simmons v. Mullen,* 231 Pa. Super. 199, 211, 331 A.2d 892, 899 (1974), the expert witness carefully explained "the testing procedure, the tests used, and how the test results were interpreted." Because the jury had ample opportunity to analyze his methodology to assess the opinion's value, the Superior Court considered the equivocal nature of the underlying data as only one factor in evaluating the properly admitted opinion.

The equivalent of Pennsylvania's Rule 705 has been proposed as an improvement to the Federal Evidence Code by Professor Paul Rice of the American University Washington College of Law and "The Evidence Project." Speaking to the Federal Rules Committee, Dr. Rice said: "the common law requires that evidence in the record support the factual basis before a litigant can inquire as to an expert's opinion on the subject. This requirement helps to maintain the role of the expert as advisor to the jury and the role of the jury as the independent finder of fact. Only if the factual basis finds support in the trial record can the jury make an independent assessment of the facts and of the expert's interpretation of the facts. If the facts of record do not support the expert's

---

16. Pennsylvania law has always been that an expert may not be asked to state his view on entirety of the evidence as a whole. Courts must not permit "a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided." *Commonwealth v. Daniels,* 480 Pa. 340, 352, 390 A.2d 172, 178 (1978).

opinion and the jury accepts the opinion as true, the jury has deferred to the expert and has not made an independent decision on the issues."

"Revised Rule 705 requires disclosure of the case-specific data an expert uses in forming opinions offered at trial." [The proposed rule seeks] "to restore the role of jury as the independent finder of facts and the role of the expert as advisor to the jury." "As stated earlier the revised rules accomplish this goal by providing the jury with all the information necessary to make an informed decision about the case and by precluding expert witnesses from offering opinions based on facts the jury either has not heard or cannot accept for their truth." The fallacious suggestion some make that the jury should be instructed that it is not being offered for the truth but simply as a basis of opinion does not solve this problem. Unless accepted for the truth, the jury has no ability whatsoever to evaluate the opinion. Certainly a jury cannot be asked to accept an expert's opinion based upon erroneous information. Likewise a jury cannot be expected to accept the truth of facts presented by an expert simply because it is someone who is cloaked with the imprimatur of the court as having a "reasonable pretension to expertise." [17]

Although adopted in 1998 and presenting the codified formulation of traditional Pennsylvania law, Rule 705 has been cited only five times in appellate decisions. The essential principle of the rule was enforced in one other very significant Supreme Court decision. These cases establish that Rule 705 demands a gatekeeper judiciary protect the role of the jury as fact-finder.

---

17. See *Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984), for application minimum standard for expert testimony.

In *McIntyre v. Philadelphia Housing Authority,* 816 A.2d 1204 (Pa. Commw. 2003), the Commonwealth Court found that a board certified neurologist had complied with Rule of Evidence 705 when he detailed the facts derived from a neurological examination he performed, a review of plaintiff's medical records, survey of a neurological data base, a review of plaintiff's psychological assessments and a medical literature search on the effects of lead poisoning.

In *Starr v. Veneziano,* 560 Pa. 650, 663 n.10, 747 A.2d 867, 874 n.10 (2000) the Supreme Court reaffirmed the factual predicate requirement of Rule 705: "There must be some factual predicate for the opinion identified on the record. See generally, Pa.R.E. 705."

In *Luzerne County Flood Protection Authority v. Reilly,* 825 A.2d 779 (Pa. Commw. 2003) the Commonwealth Court compared Rule 705 of the Eminent Domain Code with Pennsylvania Rule of Evidence 705. Oddly, Rule 705 in each codification contains similar but conflicting precepts. In *Luzerne County Flood Protection Authority,* the plaintiff appealed a jury determination of the value of seized property. Plaintiff's expert real estate appraiser was permitted to describe his opinion on value and, in accord with Rule 705, offered the facts and data supporting this opinion. However, the trial court precluded the expert from repeating attorney hearsay opinions he had solicited concerning the marketability of title.

Section 705 of the Eminent Domain Code is merely permissive,[18] it reads: "A qualification valuation expert *may,* on direct or cross-examination, state any and all facts and data which he considered in arriving at his opin-

---

18. As is the Federal Rule.

ion, whether or not he has personal knowledge there-of. . . ." The parallel Pennsylvania Rule of Evidence, Rule 705, is mandatory: "However the expert *must* testify as to the facts on which the opinion or inference is based." Despite the difference, the Commonwealth Court found that: "Both rules inherently adopt the requirement that expert testimony must be grounded in judicially relevant and competent testimony." The Commonwealth Court adopted the Superior Court's explanation in *Primavera v. Celotex Corp.,* 415 Pa. Super. 41, 608 A.2d 515 (1992): "The expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert regularly relies on and uses similar data in the practice of his or her profession. The kind of data contemplated by the rule is . . . the kind of data used daily by experts in making judgments, reaching diagnoses and taking actions." "The fact that experts reasonably and regularly rely on this type of information merely to practice their profession lends strong indicia of reliability to source material when it is presented through a qualified expert's eyes."

"The above analysis depends, of course, on the expert actually acting as an expert and not as a mere conduit or transmitter of the content of an extra judicial source. An expert should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination." [19]

---

19. This precept is the basis for the Pennsylvania Supreme Court's rejection of the Learned Treatise hearsay exception. See *Aldridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292 (2000). This proposition was

Affirming preclusion of the hearsay opinion of non-testifying lawyers, the Commonwealth Court held that exclusion was proper because plaintiff's expert "was not qualified to opine on legal matters, and thus was not able to bring to bear his own expertise to evaluate the attorney's opinions he sought to relate." Thus unevaluated hearsay or other case-specific factual material cannot be considered evidence "of record" to sustain an opinion.

In *Wenger v. West Pennsboro Township,* 868 A.2d 638, 643 (Pa. Commw. 2005), the Commonwealth Court reaffirmed that an expert must present the factual basis of any opinion in direct examination. The court relied upon and quoted the Supreme Court decision in *Starr v. Veneziano:* "we need not resolve here the precise character of the evaluation which must be undertaken by a plaintiff's expert, as the record in the present case contains no evidence that Starr's expert undertook any such appraisal. We merely hold that there must be some factual predicate for the opinion identified on the record, see generally, Pa.R.E. 705. . . ."

Finally, the Supreme Court decision *Commonwealth v. Smith,* 580 Pa. 392, 861 A.2d 892 (2004), establishes that counsel may not bootstrap factual material into a case through opinion evidence. Expert opinion itself cannot establish any case-specific fact. While not referencing Rule 705, the Supreme Court in *Commonwealth v. Smith* held that an expert's factual basis identified in testimony, if not independently proven "of record," does

recently reaffirmed in *Beaumont v. ETL Services Inc.,* 761 A.2d 166, 171 n.8 (Pa. Super. 2000) "[an expert] is not permitted to merely restate another's conclusions without espousing his own expertise and judgment."

not establish the fact and accordingly may not be argued to the jury. Following a homicide conviction, the Commonwealth called a psychiatric expert to testify at the death sentence phase of trial. The expert testified that aggravating factors existed which justified imposition of the death penalty. One aggravating factor, Dr. O'Brien explained to the jury, was the fact that the defendant had a prior conviction for assault upon a fellow prisoner. No independent proof of the conviction was offered. In closing argument, the prosecutor argued that the defendant's prior conviction was an aggravating factor which the jury should consider. The Supreme Court reversed. The Supreme Court noted: "The Commonwealth accurately recounts Dr. O'Brien's testimony. Yet that does not end our inquiry. Next we must determine whether this testimony, standing alone, serves to establish that appellant was indeed convicted of assaulting a fellow prisoner, thus rendering the prosecutor's remark as being properly based on fact of record.

"We conclude it does not. There is no indication that Dr. O'Brien was present at, or somehow participated in, the alleged adjudication of appellant on the charge of assaulting a prisoner." [20]

Significantly the Supreme Court said: "Furthermore, Dr. O'Brien's status as an expert does not, in and of itself, render his unsupported reference to appellant's alleged conviction of assaulting a fellow prisoner into a fact of record. Thus, we find that the prosecutor's reference to appellant's alleged conviction for assaulting another prisoner improperly referenced a fact not of record."

20. *Commonwealth v. Smith,* 580 Pa. 392, 861 A.2d 892, 897 (2004).

Clearly, opinion testimony cannot bootstrap itself into becoming "facts of record" by incorporating case-specific information not independently demonstrated.

Thus, Pennsylvania common-law tradition, the plain reading of Rule 705 and appellate decisions make clear that the explication of the factual predicate for opinion evidence is not the obligation of the cross-examiner. The requirement of Rule 705 to articulate the factual basis "of record" on which opinion evidence is based is on the proponent who must clearly provide the factual basis of record in direct examination so that the jury may factually evaluate the testimony.

Juries are impaneled to determine the true facts. Only if the facts on which opinion testimony is based is presented can the opinion be evaluated. Where facts are hidden because the factual basis of opinion testimony is not revealed, the jury does not have the tools required to do their job. Rule 705 precludes a summary expert opinion trial by eliminating the possibility that the factual basis will be concealed from jury evaluation.

The requirement of Rule 705 to present "facts and data" which form the basis of an opinion presented to the jury for evaluation may not be satisfied by reciting the material reviewed and considered. A ritualistic identification of voluminous depositions, libraries of medical literature, and thousands of documents, while intended to impress the jury by quantity, in fact absolutely obscures what Rule 705 is intended to clarify. This presentation of quantity is the same as offering an opinion based on all the evidence, prohibited precisely because it obscures the true basis of opinion.

The clear language of Rule 705 precludes the bare reference to litigation materials. "The expert must testify

as to the fact on which the opinion is based." While an expert certainly may rely on deposition testimony, he must testify in direct examination to the facts contained in the deposition on which the expert relied, not simply point to 12 inches of mostly irrelevant pages of testimony prominently displayed to the jury. While an expert may reasonably rely on a body of medical literature, he must testify in direct testimony to the facts or data which the expert has digested and formulated into his individual personal expert opinion. While an expert may rely on case-specific adverse incident reports or a defendant's internal documents, he must testify in direct examination to the information contained in the 40 or 50 reports piled high for visual display which is the factual basis of the material. The expert must also explain how the factual basis relates to his opinion.

A just trial is the application of logic to a courtroom. Where it becomes clear that the facts on which an expert opinion is based cannot logically support the conclusions offered, the trial judge as gatekeeper must exclude the testimony.

Thus, Pennsylvania law protects the integrity of the fact-finding process and the function of the jury by requiring the expert to explain the factual basis of any opinion, and that factual basis must be independently of record. Only if the factual basis is presented for evaluation and that factual basis is logically connected to the opinion can the application of expertise in the language of Rule 702 "assist the trier of fact to determine a fact in issue." The court is the "gatekeeper" charged with enforcing Rule 705 so that the jury is given a sufficient factual basis to evaluate the expert opinion offer. The court must analyze the basis and logic of the testimony

to insure that the highly paid expert having reasonable pretension is indeed presenting an opinion which will assist and not merely something which is dressed up to look like science.

By requiring the expert in direct examination to present the "facts or data," Rule 705 prohibits the expert from hiding the factual failings and discrepancies in the opinion. Application of this rule, however, requires intense judicial scrutiny. The practicing bar, imbued with the federal approach, will inadvertently or intentionally ignore the substantive difference in Pennsylvania law.

In summary, Rule 705 contains three distinct requirements: (1) The factual basis must be explained by the expert in direct examination, (2) The factual basis must be independently "of record," and (3) The expert cannot bootstrap an opinion by "adding" facts to the record assumptions or conclusions about which the expert has no independent knowledge.

Within this framework we may examine the testimony of Dr. Harris Busch, the only expert presented by plaintiffs to opine that defendant Wyeth was negligent. Dr. Busch's conclusory statement, vigorously asserted throughout his testimony, was that defendant Wyeth missed a "signal" that Fen-Phen caused valvular heart disease.

Without question, whether or not a "signal" should have been recognized by defendant Wyeth and should have resulted in warning the medical community that Pondimin was associated with a risk of valvular heart disease is not within the realm of ordinary experience and is the central issue in the liability phase of Fen-Phen litigation. Expert testimony is needed for a jury to determine whether the medical and scientific evidence which

Wyeth knew about, or in the exercise of due diligence as a prudent pharmaceutical company should have known about, "signaled" a problem with the drug. At this trial, only Dr. Busch testified that any such "signal" existed.

Expert testimony is the personal professional opinion of a properly qualified individual, applying specialized knowledge to the evidence presented at trial, or to other "of record" facts on a subject beyond the common understanding of a jury. "Because of this special skill or knowledge, an expert is permitted to give explanations and draw inferences not within the range of ordinary knowledge, intelligence and experience, and to give an opinion and state reasons for that opinion."[21] Accordingly, the first issue any court must resolve when confronted with proposed expert testimony is whether the expert meets the minimal requirements to provide expert opinion testimony. Except as codified in the MCARE Act, 40 P.S. §1303.101 et seq., these requirements in Pennsylvania and throughout the nation, are remarkably lax. To testify as an expert, a witness must only present a "reasonable pretension to expertise" in the specific area under investigation.[22]

Dr. Busch has reasonable pretension to expertise on the topic of what a reasonably prudent pharmaceutical company should consider as a signal to warn the medical community about serious potential adverse side effects of a medication. Dr. Busch has been a professor for 38 and a research scientist for 45 years. He was a professor of Pharmacology and chairman of the Pharmacology Department at Baylor College of Medicine in the 1960s.

---

21. Pennsylvania SSCJI 5.30; Pennsylvania SSCJI 4.10(A).

22. See *Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984).

He has been a professor at Yale, the University of Illinois and at Baylor. In these teaching capacities he has taught medical students working on doctorate degrees in pharmacology. He has consulted for three major pharmaceutical companies, Eli Lily and Company, Bristol Myers and SmithKline. As a consultant for SmithKline, he served as chairman of their "Scientific Advisory Committee," reporting directly to the president of the company. As a consultant, he advised on drug safety, drug labeling and package inserts. Dr. Busch has been asked on three occasions to consult in Fen-Phen litigation by the defense.[23]

Dr. Busch has served as an editor and peer reviewer for medical journals. He has reviewed grants from the National Science Foundation, the National Cancer Institute, the National Institutes of Health, and the American Cancer Society. He considers himself an expert in pharmacology, toxicology, biochemistry and internal medicine.

Clearly, specialized knowledge beyond that possessed by a layperson is needed by the trier of fact to understand the evidence and determine the facts in issue in this case. Clearly Dr. Busch is qualified as an expert by his knowledge, skill, experience, training and education. There is no question that Dr. Busch meets the minimal requirements to render an opinion as to the appropriate response of a prudent pharmaceutical company reviewing medical literature and evaluating adverse drug event reports.

Dr. Busch, in direct examination, presented his opinion in conclusory form, generically referring to voluminous materials as the factual basis for his opinion. He offered a number of purportedly scientific bases for his

---

23. N.T., October 25, 2004, p. 14.

opinion. On cross-examination, however, it was systematically demonstrated that many of the scientific bases on which his opinion supposedly relied were illogical, inapplicable or employed circular reasoning. It was also demonstrated that his employer, the plaintiffs, had failed to provide him with information he reasonably required and had specifically asked for. In a different context but applicable herein, the Superior Court eloquently said: "The question is: [I]s the science good enough to serve as the basis for the jury's findings of fact or it is dressed up to look good enough, but basically so untrustworthy that no finding of fact can properly be based on it. If the later is true, the integrity of the trial process would be tainted were the jury to consider it."[24]

### I. *Dr. Busch Received Only Limited and Prescreened Material. He Did Not Get Information He Reasonably Required and Had Requested.*

All of the material Dr. Busch reviewed in connection with his testimony had been provided to him and screened by plaintiff's lawyers.[25] He requested but did not receive from plaintiff's lawyers specific documentation which was available through discovery:[26]

"Q. OK. The documents dealing with what the company did or didn't do, you received from the plaintiff's lawyers, correct?

---

24. *Blum v. Merrell Dow Pharmaceuticals Inc.,* 705 A.2d 1314, 1322 (Pa. Super. 1997).

25. N.T., October 25, 2004, p. 30, ll. 14-21.

26. N.T., October 25, 2004, p. 31, l. 18. It is unclear whether Dr. Busch was referring to the specific lawyers involved in this case or the plaintiff's bar generically.

"A. That is correct.

"Q. You didn't do your own investigation or your own study or your own research of the universe of documents from the company, correct?

"A. I have asked many times from attorneys for the company for documents that would support or alter a position but I never received one.

"Q. Never received any from the company. Did you ask the people who have paid you three million dollars to testify in these cases for those documents?

"A. Of course.

"Q. Did they give them to you?

"A. Absolutely.

"Q. Did they give you the Servier documents when you asked for them?

"A. I did have very few Servier documents.

"Q. Did you ask for the Servier documents from plaintiff's counsel?

"A. I have.

"Q. And they didn't give them to you, correct?

"A. I have received very few Servier documents."

Dr. Busch only reviewed a "very small number of FDA documents provided to him by plaintiff's counsel.[27] He reviewed the portions of the MDA new drug application provided to him by plaintiff's counsel but found no report of valvular heart disease in any body in the clinical studies.[28]

---

27. N.T. October 26, 2004, a.m., p. 27, l. 7.
28. N.T., October 26, 2004, a.m., p. 28.

## II. *Dr. Busch's Opinion Was Improperly Based Upon the "Entire Record."*

In direct examination Dr. Busch generally referred to but did not identify 20 depositions he thought were relevant to this case. He testified he had read these depositions over thousands of hours. He reviewed internal documents and adverse drug events reports selected and provided by plaintiff's counsel. He reviewed only attorney summaries of the plaintiff's medical records. He did a complete medical literature search. These factual bases were only presented in summary form to the jury, no specific facts upon which Dr. Busch relied were ever presented to jury evaluation.

## III. *Without Any Factual Basis Dr. Busch Testified His Opinion That the Wyeth Surveillance Department Was Inadequate.*

Dr. Busch opined that the surveillance department of Wyeth was neither adequately staffed, trained or qualified. He testified that the defendant had no cardiologist on staff.[29]

Although on direct examination Dr. Busch generally testified that the entire surveillance department was not adequately staffed, adequately trained or qualified to their tasks, on cross-examination he admitted he had no factual basis for this conclusion beyond the circular logic that they were unqualified because they missed the "signal" which only Dr. Busch could discern. Dr. Busch was cross-examined about "some of the opinions you have about the people who worked at Wyeth and whether they

---

29. N.T., October 25, 2004, pp. 68-73.

were competent and trained to do their job." Initially he was asked about Enin Ballard.

"Q. In what way was he unqualified, to the extent you think he was unqualified?

"A. He didn't understand the problems that were ongoing.

"Q. In terms of his training and qualifications, doctor, in what way was Enin Ballard unqualified to do his job at Wyeth Laboratories?

"A. I can't answer the question without a list of his qualifications." [30]

The same questions were asked concerning Axle Solan:

"Q. Was he unqualified?

"A. I don't have his qualifications here. If you have them, I'll be happy to review them.

"Q. You don't know one way or the other whether he was unqualified do you?

"A. Not off the top of my head." [31]

He was questioned about Mark Dietch, identified as the vice president in charge of medical affairs and the senior medical officer in the company. Dr. Busch testified that he thought he was unqualified.

"Q. In what way?

"A. He didn't understand the problems. And he didn't understand what to do about it. All he was concerned about was profit." [32]

Dr. Busch was asked whether Amy Myers was unqualified. The witness testified: "I think so."

30. N.T., October 25, 2004, p. 101.
31. N.T., October 25, 2004, p. 102, l. 11.
32. N.T., October 25, 2004, p. 103.

"Q. Is she a pharmacist?

"A. She may be, I'm not sure.

"Q. Was she unqualified to do her job just because she wasn't a cardiologist, is that your opinion?

"A. No.

"Q. Was she not trained to do her job, doctor?

"A. She wasn't trained properly, no.

"Q. What training did she have?

"A. Don't know. She didn't recognize the signals."[33]

Dr. Busch was asked about Fred Wilson who was identified as a pediatrician.

"Q. What was his job?

"A. He was also in safety surveillance.

"Q. Was he ever the medical monitor for Pondimin?

"A. Part-time.

"Q. Was he ever the full-time medical monitor of Pondimin?

"A. Don't know.

"Q. Unqualified?

"A. He didn't recognize the signals.

"Q. Was Dr. Wilson not adequately trained for his job?

"A. In my opinion, he was not.

"Q. What was the basis for that opinion?

"A. He did not recognize the signals."[34]

Dr. Busch was asked about Dr. Phillip Devain whose deposition he had read, but he did not recall anything

---

33. N.T., October 25, 2004, p. 103, l. 23.
34. N.T., October 25, 2004, p. 104.

about Dr. Phillip Devain, a cardiologist in the Medical Affairs Department at Wyeth.

Dr. Busch was asked about Roberta Michaelis who was involved in safety and surveillance personnel.

"Q. Was she unqualified to do her job?

"A. Don't know." [35]

This testimony was elaborated:

"Q. Is it your opinion, doctor, that Roberta Michaelis was not up to snuff?

"A. No.

"Q. Not your opinion?

"A. She wasn't trained to appreciate the problems of valvular heart disease.

"Q. What training did she have?

"A. Don't know.

"Q. What degrees did she have?

"A. Don't know.

"Q. Did she have a medical degree?

"A. Don't know.

"Q. Pharmacy degree?

"A. I don't know what degrees she had, sir. And repeating the question won't help my memory." [36]

Dr. Busch was asked about Dr. Kelly Davis, an M.D.

"Q. Was she qualified?

"A. Don't know." [37]

---

35. N.T., October 25, 2004, p. 106.
36. N.T., October 25, 2004, p. 108.
37. N.T., October 25, 2004, p. 108.

He was asked about Ginger Constantine, a physician involved in clinical trials.

"Q. Do you think she was incompetent?

"A. Don't know.

"Q. Qualified to do her job?

"A. Don't know.

"Q. Adequately trained to do her job?

"A. Don't know."

Dr. Busch was asked about Paul Menacosi, whose deposition he had read.

"Q. Who is he?

"A. Don't know.

"Q. What did he do at Wyeth?

"A. Don't know.

"Q. Was he competent to do his job?

"A. Can't say.

"Q. Was he the medical monitor for Pondimin?

"A. One of.

"Q. What kind of degree did he have?

"A. Don't know.

"Q. What kind of training?

"A. Don't know."[38]

Dr. Busch was asked about Jess Amgem, whose deposition he had read. Dr. Busch acknowledged that he did not know Mr. Amgem's training.

"Q. Don't know his qualifications?

"A. Correct.

---

38. N.T., October 25, 2004, p. 109.

"Q. Don't know if he was competent to do his job, do you?

"A. Don't know."

No basis for Dr. Busch's opinion that the surveillance department of defendant Wyeth had been neither adequately staffed nor adequately trained nor adequately qualified was in any way further explained on redirect examination. The only basis ever presented for this opinion was the voluminous unspecified materials that Dr. Busch claims to have read and his circular reasoning that, because the defendant corporation missed a signal, the surveillance department must necessarily have been inadequately staffed, inadequately trained and otherwise unqualified.

An expert witness must provide a basis grounded in logic and in case-specific factual knowledge for an opinion to assist the jury. The opinion of Dr. Busch as to the qualifications of the surveillance department had no basis in fact and cannot stand as the basis of a verdict. Since we cannot determine whether this opinion was the basis for the liability verdict, without anything more, a new trial must be granted.

### IV. *Serotonin, and Other Medical Literature.*

On direct examination Dr. Busch presented conclusory testimony that the medical literature contained descriptions of valvular heart disease in connection with serotonin, methysurgide ergotamine, and carcinoid syndrome. Dr. Busch testified, without explanation, that the literature demonstrating that serotonin could cause valvular heart disease should have put the defendant on notice of Fen-Phen's propensities.

"Q. In your opinion should this literature have put Wyeth on notice that serotonin in drugs could cause valvular heart disease.

"A. Absolutely." [39]

In cross-examination he acknowledged that everyone has serotonin in their body and purported to ground his opinion in part on the inadequacy of Wyeth's understanding of the medical literature of carcinoid syndrome.[40]

"Q. And the carcinoid syndrome that you talked about as something that should have given Wyeth notice, actually caused a large increase in serotonin levels?

"A. In general that's correct.

"Q. But to the extent that carcinoid syndrome literature was out there, prior to 1997, all it would tell Wyeth is if your drug is causing a large increase in circulating serotonin there might be this possibility of valvular heart disease, right?

"A. I think so."

He admitted that there was no indication the drugs "which cause" small increase in circulating serotonin cause heart valve disease.

"Q. Prior to 1997, doctor—let me ask it this way: As of today, doctor, is there any indication that drugs, like Prozac, which cause that small increase in serotonin, cause heart valve disease?

"A. Not to my knowledge." [41]

Dr. Busch also acknowledged that while Wyeth was marketing fenfluramine there was nothing in the litera-

39. N.T., October 25, 2004, p. 62.
40. N.T., October 25, 2004, p. 116, l. 13.
41. N.T., October 25, 2004, p. 114, ll. 15-19.

ture which demonstrated that a small increase in circulating serotonin posed any risk of valvular heart disease.[42] He was specifically asked:[43]

"Q. So if Wyeth was looking at those drugs to get a sense of what effects fenfluramine might have, it would say a small amount, a small increase in the circulating levels doesn't cause valvular heart disease correct?

"A. I think that is a reasonable presumption. Yes."

Dr. Bush also acknowledged that fenfluramine did not cause any major effect on circulating serotonin and that the medical literature confirmed that fenfluramine drugs caused very little change in serotonin levels.[44]

"Q. Let's talk about fenfluramine itself. I am correct, doctor, that the vast bulk of scientific literature which looks at whether fenfluramine causes increases in circulating serotonin levels shows that it decreases the level of circulating serotonin?

"A. Well, I would say—there is only a few papers and no paper to my knowledge showed a significant increase and some may have shown a small decrease but it didn't produce any major effect."

Dr. Busch acknowledged the illogic of saying that carcinoid syndrome literature was misunderstood by Wyeth because he admitted this was relevant only if Pondimin caused large increases in circulating serotonin, which it does not.

Accordingly, Dr. Busch's generalized statement in direct examination that the literature on serotonin levels should have signaled that fenfluramine might have a caus-

42. N.T., October 25, 2004, p. 115, ll. 11-16.
43. N.T., October 25, 2004, p. 115, l. 17.
44. N.T., October 25, 2004, p. 115, l. 23.

ative effect of valvular heart disease is entirely belied by his own testimony on cross-examination. By his own admission, his conclusion is not supported by either record evidence or medical literature. It is opinion dressed up to look erudite.

Along the same serotonin line of reasoning, Dr. Busch testified to a theory of biological mechanism by which Pondimin could cause heart valve disease. He testified that fenfluramine could be converted to norfenfluramine which would then bind to serotonin receptors. He acknowledged that he had done no personal research to test this theory but claims to have read articles that described it. He admitted, however, that this literature could not have been known to Wyeth at any relevant time because every one of the articles had been published long after the defendant had ceased selling Fen-Phen.[45]

"Q. So those articles couldn't possibly have been noticed to Wyeth while Wyeth was selling Pondimin. Correct, doctor?

"A. Correct."

Obviously this theory could not have been considered by Wyeth at any relevant time.

Dr. Busch testified that two drugs used for migraine headaches, ergotamine and methysurgide, which were chemically similar to serotonin caused valvular heart disease. On cross-examination he acknowledged that they are not chemically similar to Pondimin. He admitted that there were very significant differences between ergotamine and methysurgide and fenfluramine.[46]

---

45. N.T., October 26, 2004, a.m., p. 12, l. 24.
46. N.T., October 25, 2004, p. 117.

"Q. They are not similar in their pharmacological action to fenfluramine, correct?

"A. True.

"Q. They're not used for the same purpose.

"A. True.

"Q. They have an overall side effect profile which is totally different. Correct?

"A. True."

No basis whatsoever other than Dr. Busch's qualifications as having reasonable pretensions to expertise were presented to the jury as the basis for any opinion that the literature concerning ergotamine or methysurgide should have put Wyeth on notice of any risks associated with fenfluramine.

### V. *Adverse Drug Events.*

The only factual basis identified in direct examination, albeit generally, were adverse drug event reports received by the defendant which were "reports of patients ingesting fenfluramine and developing valvular heart disease. . . ."[47] However, the specific questions asked on direct examination did not clarify, but rather obliterated, any understanding of a factual basis for the expert's opinion. The questions directed the expert to all adverse event reports which contained any notation of fenfluramine and of valvular heart disease with or without regard to causation. He was asked:

"Q. Now, did you also review adverse event reports specifically with regard to valvular heart disease and fenfluramine in 1993 and 1994?

---

47. N.T., October 25, 2004, pp. 72-73.

"A. Yes, sir.

"Q. Did you see any evidence in those adverse event reports that you have reviewed of patients taking fenfluramine and having valvular heart disease in 1993 and 1994?

"A. Yes, sir, there are." [48]

He was never asked on direct examination whether any adverse drug events report actually demonstrated valvular heart disease caused by fenfluramine. Instead, after testifying that there were adverse incident reports containing the two words, Dr. Busch provided the conclusory opinion[49] that these adverse event reports "with regard to valvular heart disease and fenfluramine" indicated a signal.[50] Dr. Busch was then asked to review the summaries of these ADE's contained on "line listings" and was shown plaintiff's exhibit 52.

Rather than respond to plaintiff's questions as to whether exhibit 52 contained valvular heart disease reports on fenfluramine, Dr. Busch asked plaintiff's counsel to lead him through the exhibit. The court interjected the question of whether or not he knew whether the lines on exhibit 52 contained valvular heart disease reports on fenfluramine. The witness acknowledged that he did not.[51] Thereafter, without objection, plaintiff's counsel led Dr. Busch through the exhibit, testimony which consisted of nothing beyond the expert reading line entries displayed by counsel. This procedure was repeated with exhibit 54, another "line listing sheet." This meaning-

---

48. N.T., October 25, 2004, p. 74.

49. N.T., October 25, 2004, p. 74.

50. N.T., October 25, 2004, p. 75.

51. N.T., October 25, 2004, p. 79, l. 8.

less recitation and enumeration of reports containing designated words continued until the witness himself acknowledged that the lines containing both fenfluramine usage and a notation of valvular heart disease on exhibit 54 were "in part they're a repeat"[52] of the same adverse drug event reports presented to the jury line by line by counsel in exhibit 52.

In redirect examination, numerous ADE exhibits were moved into evidence and Dr. Busch was handed two notebooks entitled "ADE binder 1" and "ADE binder 2," which were displayed before the jury on the witness stand. He testified that he reviewed the adverse drug event contained in those binders and they constituted the basis of his scientific expert opinion.[53]

"Q. Did you mean that every other document in that book formed the basis of your opinion.

"A. Yes."

All the ADEs contained in those binders were accepted into evidence on that basis. However, his further testimony concerning the basis of his opinion was as follows:[54]

"Q. Who assembled those notebooks?

"A. Oh, I don't know.

"Q. It wasn't you?

"A. Not sure.

"Q. Who selected the ADEs to go into them?

"A. I don't know.

---

52. N.T., October 25, 2004, p. 85, l. 3.
53. N.T., October 26, 2004, a.m., p. 73, l. 10.
54. N.T., October 26, 2004, a.m., p. 89.

"Q. How many are there? How many are there? How many adverse drug event reports are there in the notebooks?

"A. I would say 20 to 40.

"Q. And those are the ones you're relying on for your opinions here?

"A. In part, sure.

"Q. And how many of those came from foreign reporters?

"A. I don't know.

"Q. How many came from Servier?

"A. A number, but I don't know.

"Q. How many were U.S. reports of people who use Pondimin in this country?

"A. Don't know.

"Q. How many had valvular regurgitation noted only as an incidental lab report rather than as the adverse event?

"A. Don't know.

"Q. How many had valvular regurgitation actually identified as the reported adverse event?

"A. Don't know.

"Q. How many of them involved renal failure leading to valvular heart disease?

"A. I don't know that any had renal failures leading to valvular heart disease.

"Q. How many had renal failure?

"A. I don't know.

"Q. How many had renal failure and some degree of valvular regurgitation?

"A. Don't know."

Of critical significance was his testimony that, before rendering his purportedly scientific professional opinion, he was unconcerned whether valvular regurgitation was noted in the ADE as only an incidental finding. Neither had he determined how many ADEs on which he relied had identified valvular regurgitation as the reported adverse event.[55] Indeed, he merely concluded that, if reported, there was an association.

Dr. Busch was cross-examined about his factual analysis of the adverse drug events reports.

"Q. Can you tell the jury . . . how many adverse drug event reports Wyeth got on users of Pondimin where a doctor said I gave Pondimin to somebody and one of things that developed was valvular regurgitation?

"A. I can't give you a precise number but there were multiple reports. . . .

"Q. On what do you base that answer, doctor?

"A. On the documents that I have from adverse reaction reports."[56]

While facially reasonable and facially adequate, the function of an expert witness is to apply specialized knowledge to the analysis of these documents. Any juror can read a form to determine whether it contains the word fenfluramine and the word valvular heart disease.[57]

_____

55. An amateur analysis performed by the court after the verdict reveals.

56. N.T., October 25, 2004, p. 118.

57. Indeed, a lay analysis performed in judicial chambers seems to reveal that, of the 38 reports, 12 had valvular regurgitation or valvular insufficiency noted as incidental in either the "Law data" or "Relevant history" sections of the form; six appear to have neither term noted in

The function of an expert witness is to apply expertise and, from the language and explanations provided by the ADE forms, to draw medically and scientifically valid conclusions. The medical and scientific conclusions presented in direct examination by Dr. Busch, purportedly from an analysis of this material, was that the adverse drug event reports received by the defendant should have demonstrated a signal that a causative relation existed. However, not one individual adverse event report was explained to the jury in direct examination and, as demonstrated in cross-examination, not one specific example could be used by Dr. Busch to provide an explanation.[58]

A factual basis was further lacking. Dr. Busch was asked about reports of U.S. patients with valvular heart disease through June 5, 1996.[59]

"Q. I want to ask you, focusing on this computer printout that was testified to yesterday by you, I want to ask you, how many reports do you see on this data base printout, U.S. patients with valvular heart disease through June 5, 1996?

"A. . . . . Yes, I see vascular disorder and I see two cases above that of valvular heart disorder."

Having identified only two reports, the witness was unable to testify whether or not he had ever actually reviewed the adverse event report identified as valvular

the report; and 10 involve renal failure. The court notes that under Pennsylvania law it is not the defense to present this analysis.

58. It must be noted that, since there were not more than 40 such adverse drug events upon which Dr. Busch relied, there was no practical impediment to charts summarizing the results (See Pa.R.E. 1006) or even to a specific case-by-case review.

59. N.T., October 26, 2004, a.m., pp. 17, 18.

disorder. "I may well have, but I have not reviewed it recently."

Dr. Busch was extensively questioned about the analysis he had performed and his knowledge of the ADEs.[60]

"Q. How many people using Pondimin in the United States gave rise to a report of valvular heart regurgitation as an adverse event?

"A. I don't have it separated by the United States. I have the total. And I have dexfenfluramine and Pondimin. But I don't have them separated outside but dexfenfluramine is Pondimin in terms of its activity so it's about the same.

"Q. And you can't tell us, one way or the other, whether there was one from the United States or 10?

"A. Presumably, if it came from AHP, which American Home Products, the predecessor of Wyeth, there are many, many reports. And I would have to say perhaps 20 many 30, 40 until 1995, perhaps 50 or 60 reports. And they're listed in this documents.

"Q. And what document is that, doctor?

"A. It's call summary of reports of left side valvular heart disease prior to 12-31-95.

"Q. Have you looked at those reports, doctor?

"A. I've been through them, yes. I don't have them here but I've been through them.

"Q. You've actually reviewed the adverse drug events reports?

"A. I have.

"Q. It's your testimony to this jury that there were dozens from the United States, correct?

60. N.T., October 25, 2004, p. 119.

"A. No. I said I can't differentiate, I don't know they're from the United States or not. There are many, many reports listed here."

Dr. Busch testified he had approximately 100 reports from foreign users of fenfluramine or dexfenfluramine. Despite testifying about hundreds from outside the United States and "perhaps 20, maybe 30, 40, perhaps 50 or 60 reports" from AHP, the predecessor of Wyeth, Dr. Busch was incapable or unwilling to testify to anything specific about any report.

"Q. And of those foreign reports, how many of those people had valvular heart disease according to the ADE forms before they ever used the drugs?

"A. Don't know.

"Q. Wouldn't it be important if you are going to opine about a signal to know how may of those adverse event reports actually had the condition before they used the drug?

"A. In my opinion it shouldn't report as a ADE from the drug if they already had the disease before they took it."

Dr. Busch was unable to determine how many of the ADEs he reviewed may have had a confounding factor caused by additional ingredients contained in foreign combinations such as Chinese herbs leading to renal failure.[61]

"Q. And of the people who use—people who reported valvular heart disease, as to whom valvular heart disease was reported from overseas, how many of those had taken Chinese herbs in conjunction?

---

61. N.T., October 25, 2004, p. 124.

"A. Chinese herbs don't cause aortic or myometrial valvular heart disease.

"Q. How many had taken Chinese herbs?

"A. Don't know."[62]

Dr. Busch identified 10 cases from Belgium. He was asked about these adverse incident reports:

"Q. And how many of those patients had taken those slimming cocktails we were discussing yesterday?[63]

"A. Don't know.

"Q. How many had taken Chinese herbs?

"A. Don't know."

Only one of those 10 patients had just taken fenfluramine alone.[64] Either Dr.Busch has entirely disregarded the possibility that an ADE mentioned both words valvular heart disease and fenfluramine but there was no possible causative connection because the valvular heart disease preceded ingestion or he chose to ignore the possibility based on the bold unsupported assumption that an ADE would not be submitted if the patient had valvular heart disease before ingestion. Whichever is true, no explanation was given to the jury.

Indeed Dr. Busch seemed to think that any ADE submitted which mentioned fenfluramine usage and men-

---

62. As Dr. Busch himself conceded, some Chinese herbs do cause renal failure and renal failure can cause valvular heart disease. The testimony was clear during the course of the trial that numerous concoctions including fenfluramine in Europe contained Chinese herbs.

63. Slimming cocktails included other ingredients not included in the United States variety of fenfluramine. The Belgium slimming cocktails included magnolia, stephania, and belladonna. N.T., October 26, 2004, a.m., p. 20.

64. N.T., October 26, 2004, a.m., p. 21.

tioned valvular heart disease implied any causative relation.[65]

"Q. When a physician or a hospital or a pharmacist or anybody reports an adverse drug event, they're not saying that the drug caused the event, correct?

"A. They are saying the drug is associated with the event.

"Q. They are saying the drug was being taken and the event occurred. And that's all they are saying, right, doctor.

"A. That's an association yes.

"Q. Oh, to you an association is simply a coincidence in time?

"A. It is a coincidence in time, with the thought that the drug is involved in causation. Why would they report it otherwise.

"Q. But they're not concluding that it did cause it. They're not even saying it might have caused it. All the reporter is saying is that the person was taking the drug and the person later had this condition, correct?

"A. I don't agree with that."

No medical or scientific justification was ever presented for this odd conclusion derived from a form which specifically asks for incidental findings. A judicial layperson's review of the ADEs demonstrates numerous ADEs upon which Dr. Busch purports to rely contained the valvular heart disease notation only as an additional condition of the patient.

---

65. N.T., October 25, 2004, p. 125.

## VI. *Literature Search.*

Although Dr. Busch testified on direct examination that he had performed an extensive literature search which formed a scientific basis for his opinions about Pondimin, he acknowledged in cross-examination that this literature search was limited.[66]

"Q. Are you familiar with any literature medical literature, published while Pondimin was on the market which dealt with those Belgium cases.

"A. No."

Dr. Busch did, however, acknowledge having read an article from the *Lancet* published in February of 1993 which included descriptions of the Belgian cases which dealt with Chinese herbs and slimming cocktails. This 1993 article found no link between fenfluramine and valvular heart disease in the Belgian examples. In fact, Dr. Busch acknowledged that there was no literature anywhere in the world prior to 1997 that demonstrated any link between fenfluramine and valvular heart disease.

"A. Not that I am aware of.[67]

"Q. And you have researched the world's literature, haven't you?

"A. I have." [68]

Dr. Busch generally referred to animal studies as supporting his opinion. One animal study referred to in direct examination involved fenfluramine. Dr. Busch acknowledged that this study did not find any valvular heart disease.

---

66. N.T., October 26, 2004, p. 21, l. 15.
67. N.T., October 26, 2004, p. 24, l. 25.
68. N.T., October 26, 2004, p. 25.

"Q. But it didn't find any valvular heart disease, right?

"A. That's true."[69]

Likewise, a second article referenced in direct examination which did find valvular heart problems did not concern fenfluramine.[70]

"Q. But it didn't have fenfluramine, right?

"A. Did not, had serotonin."

Indeed, in cross-examination Dr. Busch confirmed that there was no animal study literature supporting any connection between fenfluramine and valvular heart problems.

"Q. And there is not a single article anywhere in the medical literature prior to the time or during the time Pondimin was on the market in which people gave fenfluramine to animals and showed the development of valvular heart disease, correct?

"A. True."[71]

Dr. Busch presented no factual basis which the jury could possibly evaluate. The vast bulk of the purported basis of his opinion was conceded in cross-examination to be logically irrelevant, factually incorrect or purely of circular reasoning. The remainder of the purported factual basis of the opinion, namely the 20 to 40 ADEs, were not presented to the jury in any way that permitted factual evaluation.

Indeed, taken in the light most favorable to the verdict winner, toward the end of a long examination when defendant was forced into establishing the basis for Dr.

---

69. N.T., October 26, 2004, p. 26 of 94.

70. N.T., October 26, 2004, p. 25.

71. N.T., October 26, 2004, p. 26, l. 9.

Busch's expert opinion on cross-examination, Dr. Busch refused to answer specific questions about the basis of his opinion by stating "I don't know" to every question about the content of the ADEs. It is possible, taking Dr. Busch literally, that he did not know. If accepted as literally true, his lack of knowledge undercuts all factual basis for his testimony. He cannot rely, at least not without scientific explanation and justification, on incidental findings contained in an adverse incident report to conclude that defendant Wyeth missed a signal. It is the definitional nature of logic that incidental findings are incidental.

However, Dr. Busch may in fact have a scientific medical and factual basis for his opinions. If so, it was never explained to the jury. Nonetheless, if he does have a basis, the plaintiffs should not be prohibited from proving their case. The clear violation of Rule 705 does not warrant judgment n.o.v. but does clearly warrant a new trial as to Ms. Hill, Ms. Jensen and Ms. Hansen, which is so ordered.

Rule 705 was adopted in accordance with long-standing Pennsylvania law upholding the sanctity of the jury role as fact-finder. Expert testimony is intended to assist, not supercede, the jury. Expert opinion testimony should explain and clarify the facts so that correct conclusions may be reached by lay jurors. Experts are not advocates regardless of how much a party pays them. The trial is a search for truth and may not be castrated and corseted into a battle of experts. The jury must be provided with the factual basis on which an expert grounds his opinion so that the jury remains the only finder of fact and the trial is not reduced to "a battle of experts."

Accordingly, because the testimony of plaintiffs' only expert failed to comply with the requirements of Pennsylvania Rule of Evidence 705, the motion for a new trial was properly granted.

Defendants erroneously claim that judgment n.o.v. should have been granted because the "two-disease rule" established in the asbestos context by *Simmons v. Pacor Inc.,* 543 Pa. 664, 678, 674 A.2d 232, 239 (1996), should be applied to Fen-Phen litigation and the conclusion drawn that plaintiff herein has not presented a "compensable injury." Defense motions to the effect were denied. The two-disease rule was adopted as sound judicial public policy at a time when the courts of Pennsylvania and particularly those of Philadelphia County were deluged with thousands of unmanageable asbestos claims and faced the prospect of thousands of additional claims being filed before symptomatology developed as the inexorable march of time approached each potential plaintiff's individual statute of limitations.

The policy reasons behind the adoption of the two-disease rule do not exist in the Philadelphia Fen-Phen litigation. While it is true that thousands of Fen-Phen cases are pending in Philadelphia County, a systematic approach to case management has resulted in the orderly processing, scheduling for trial and resolution of these cases on a timely basis.[72] No crisis exists in the Fen-Phen litigation comparable to the clear and present dangers

---

72. It is anticipated that every Fen-Phen case can be brought to trial consistent with the court-adopted standard of resolution within two years of initiation. It is likely that as of January 2006 there will be no Fen-Phen case over two years old on the Philadelphia County dockets.

posed by the burgeoning asbestos litigation extent when the two-disease rule was adopted.

The two-disease rule, which tolls the statute of limitations until the diagnosable effects of asbestosis had caused symptomatology, has never been applied by any appellate court beyond asbestos litigation. Indeed the precept has been cited in only one non-asbestos appellate case since its adoption. The two-disease rule was referred to, in dicta, in *Kline v. Weisberg,* 694 A.2d 644, 647 (Pa. Super. 1997) which held that a judge of coordinate jurisdiction may not overrule another judge's summary judgment ruling. The holding in *Kline* had nothing to do with generalizing the two-disease rule.[73] Were this court to believe sound policy reasons existed for the *Simmons* two-disease rationale to be applied beyond asbestos litigation, it is not the province of a trial judge to pronounce law of first impression with such broad implications by dismissing a tried case on post-verdict motions.

There are additional specific and significant substantive reasons why the *Simmons* two-disease rationale should not be extended to Fen-Phen litigation by a trial court. Fen-Phen and thousands of other such claims which have been filed in Pennsylvania may be litigated in state court only because the specific plaintiffs have chosen to "opt out" of a class action settlement approved by the Honorable Judge Louis C. Bechtle of the United States District Court for the Eastern District of Pennsylvania. This class action remains actively supervised by the Fed-

---

73. This holding has itself been overruled when the prior judge makes a palpable error of law in *Zane v. Friends Hospital,* 575 Pa. 236, 244, 836 A.2d 25, 30 (2003).

eral courts.[74] The settlement documents pertaining to that class action stipulated specific time limits for class members who wished to opt out and file individual lawsuits. Any class member who failed to timely file a lawsuit risked dismissal pursuant to statute of limitations defenses raised by defendant Wyeth and further risked dismissal by the federal court for failure to comply with designated opt-out conditions.[75]

The class action federal court settlement entered into by agreement and approved by the federal courts contains specific filing requirements. The settlement agreement permitting state lawsuits was grounded upon the inapplicability of the two-disease rule. The class action opt-out required only that the claimant met FDA case definitions for a threshold injury of aortic or mitral regurgitation. Indeed, at trial of this matter, when the two-disease rule was argued as a basis for the grant of a nonsuit, counsel for Wyeth could not state defendant Wyeth's position as to whether a second action could permissibly be brought by a plaintiff who waited until symptomatology appeared.[76] The court recessed during argument on the applicability of the two-disease rule to allow defense counsel to consult with his client before advising the court of the defendant's position concerning the permissibility of refiling this state court action when symptomatology manifested itself. Following the recess, defense coun-

---

74. See *In re Diet Drugs,* nos. MDL 1203 and Civ. A. 99-20593.

75. The federal court imposed specific restrictions on state court litigation, including a prohibition on claims for punitive damages and evidentiary preclusions later reversed by the Third Circuit Court of Appeals. The District Court has imposed restrictions on counsel in state court actions and has reserved the right to review state court individual opt-out verdicts.

76. N.T., October 5, 2004 a.m. pp. 25, 30.

sel could not state any position.[77] In light of the significant federal court involvement in Fen-Phen litigation, even Pennsylvania Appellate Court rulings cannot guarantee that a two-disease ruling will be upheld if filing is delayed until additional symptomatology has become manifest.

Additionally, the testimony in this case, taken in the light most favorable to the verdict winner, demonstrates that each plaintiff has an impairment demonstrable on diagnostic echocardiogram. In *Murray v. Hamot Medical Center of the City of Erie,* 429 Pa. Super. 625, 636, 633 A.2d 196, 202 (1993), the Superior Court found that HIV in its asymptomatic dormant state was actionable. Likewise, those who are diagnosed with FDA positive valvular regurgitation even without additional symptomatology are permitted under Pennsylvania law, whether or not they are required by the statute of limitations, to file a lawsuit.

Each plaintiff's present medical condition has treatment implications. The testimony demonstrated that each plaintiff must take prophylactic antibiotics to protect against serious risk of heart infection and must regularly have otherwise unneeded medical examinations, including echocardiograms and stress tests, to monitor her heart condition. Accordingly, there was no error in rejecting the two-disease rule of *Simmons* under the facts presented in this case.

---

77. In oral argument at post verdict motions, defendant conceded that they would waive any defense of statute of limitations for those claimants who filed a lawsuit within two years of symptomatology. This belated statement of their position as to the significance and implications of applying the two-disease rule to Fen-Phen cases does not bind the federal court even in this one case and demonstrates the risks of and complexity in applying the two-disease rule to this litigation.

Defendants claim that the application of the Learned Intermediary Doctrine requires judgment n.o.v. However, at trial each doctor testified to events that occurred five to seven years prior to their testimony. Each testified that, as a result of the revelations from the Mayo Clinic and other studies concerning the risks of heart disease, they ceased prescribing Fen-Phen to the plaintiffs in this case. Based on that testimony and the totality of the other evidence presented on this question, the jury could properly find that had adequate warnings been presented each learned intermediary would have ceased prescribing Fen-Phen to his patient. Accordingly, the issue was properly presented for jury determination.

Despite the order for new trial, one point of evidentiary error raised by the defense must be addressed. The defense claim it was error for the court to sustain the objection to expert opinion contained in defense exhibit B343, a properly authenticated and certified government document, "the Belgium report" without expert testimony. As the last piece of evidence at the trial, the defense offered exhibit B343, a foreign official record properly authenticated. No objection to authentication was raised. However, the document presents serious substantive problems and plaintiffs objected to the defendant's attempt to offer alleged expert scientific opinion through a foreign document without affording any possibility of cross-examination.

Initially, it is important to note what the Belgium report was not offered to prove. "The Belgium report" had not been reviewed by Wyeth employees and was not being offered for any purpose relating to notice or reliance. Neither was it offered to demonstrate Wyeth's knowledge at any relevant time. The report was specifi-

cally offered for the truth of the expert opinions and conclusions contained therein. Accordingly the report was clearly hearsay as defined by the Rules of Evidence.[78]

Plaintiff's expert Dr. Busch had made a passing reference to the Belgium report in his testimony. The defense retained an authenticated copy of the report in the courtroom, throughout trial. Nonetheless, the report had not been shown to Dr. Busch. Dr. Busch was not asked to explain or even comment upon the conclusions of the report. No expert witness called by the defense relied upon the Belgium report. Likewise, no defense expert was asked to explain, or justify, or support, or acknowledge, or even reference the report. Indeed, although many experts testified, not one testified that the expert opinions contained in the Belgium report were valid. Not one expert testified that the results of the Belgium report were methodologically sound or even attempted to follow any acceptable methodology. Not one expert testified that the data upon which the Belgium report was based was sufficient, or even valid. Not one expert even testified that the results of the Belgium report were relevant to any issue in the case. Not one expert testified that the authorities which adopted the Belgium report as an official government report or any of their advisors were even qualified to pass scientific judgment on the methodology, contents, underlying data or conclusions. Not one expert even testified that the opinions contained in the Belgium report were in any way accepted as authoritative by anyone. Needless to say, no opportunity whatsoever to cross-examine anyone concerning the contents of the report was afforded by this last minute presentation. The manner in which expert opinion was offered

78. Pa.R.E. 802.

violates the due process clauses of both the United States and Pennsylvania Constitutions as well as the Pennsylvania Evidence Code.

The opinions contained in the Belgium report do not even rise to the level of a learned treatise published in literature; peer reviewed, publicly disseminated, and open to refutation. Even learned treatises and peer reviewed literature which have indicia of reliability and authority are inadmissible as substantive evidence because no one is available for cross-examination.[79]

The author of the Belgium report is not identified. The credentials of the government agency or agencies who have "certified" these results are not identified. Expert opinion in a government report does not become admissible for the truth of its contents merely by authentication.

The defense claims that the Belgium report is admissible hearsay based upon Pennsylvania Rule of Evidence 803(6). Rule 803(6) provides that records of "regularly conducted activity," including "a memorandum, report, record or data compilation, in any form, of acts, events or conditions made at or near the time by, or from, information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and it was the regular practice of that business activity [to make such compilations] . . ." are admissible "unless the sources of information or other circumstances indicate a lack of trustworthiness." Alternatively, the defense contends that 42 Pa.C.S. §6014(b) provides that a copy or record of governmental action "disclosing the existence or non-existence of facts which have been recorded pursuant to official duty" is admissible. However, 42

---

79. See *Adridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292 (2000).

Pa.C.S. §§6103 and 6104 also include the proviso that "unless the sources of information or other circumstances indicate lack of trustworthiness." The Comment to the Rules of Evidence 803(8) [not adopted] explains that section B of 42 Pa.C.S. §6104 is limited to "facts" and "does not include opinions or diagnosis." This is consistent with the Supreme Court's refusal to adopt any blanket rule, and Pennsylvania decisional law interpreting the Uniform Business Records as Evidence Act. Plaintiffs challenge the trustworthiness of the sources of information and object based upon their inability to cross-examine any of the experts whose opinions are sought to be offered by documentary evidence.

In a comparable case, the Superior Court rejected the substantive use of an official state police lab report because no one was available for cross-examination. In *Commonwealth v. Carter,* 861 A.2d 957 (Pa. Super. 2004) the Superior Court en banc reversed a criminal conviction due to the ineffective assistance of counsel in failing to appeal a trial court ruling allowing into evidence a police lab report without supporting expert opinion. The report demonstrated the presence of cocaine in materials seized from the criminal defendant. At trial, the Commonwealth called a lab manager to testify to the contents of the report as substantive evidence. The Superior Court ruled the trial court was wrong in relying on Pa.R.E. 803(6), or the Business Records Exceptions to the Hearsay Rule. The Superior Court found that the lab report, having been prepared in anticipation of litigation, did not qualify as a business record. The Superior Court also discussed the implications of "Federal and state constitutional rights of confrontation and cross-examinations of witnesses" and found the evidence inadmissible. Although *Commonwealth v.*

*Carter* concerned the admissibility of expert opinion testimony without expert testimony in the criminal context, cross-examination of expert opinion evidence is of such a critical nature in complicated civil pharmaceutical litigation as to also require preclusion.

In the *Carter* case, the Commonwealth called a crime laboratory manager of the Harrisburg regional lab of the Pennsylvania State Police concerning the contents of the report. Although qualified to provide expert opinion, the crime laboratory manager testified only in accord with his role as custodian of the lab report as to how and when the reports are generated and the manner in which they are stored in the regular course of the crime lab's business. The Superior Court noted: "The Commonwealth did not attempt to certify Mr. Reigle as an expert. However, even if we characterize his testimony as expert testimony, we find that Mr. Reigle recited the results of the test as indicated in the report (or basically just read the report) rather than ennunciating his own opinion developed upon his review of the file. It is fundamental that an expert cannot merely echo another person's opinion as contained in a report prepared by that other person. See *Woodard v. Chatterjee,* 827 A.2d 433, 444 (Pa. Super. 2003)." In *Commonwealth v. Carter,* the Superior Court noted: "In the instant case, even if the Commonwealth had proferred Mr. Reigle as an expert, his testimony would nevertheless have been unacceptable as it merely echoed the data and results contained in the lab report which he did not prepare. Moreover, if Mr. Reigle had testified as an expert, the lab report itself would remain inadmissible hearsay although as an expert Mr. Reigle would have been entitled to rely upon it in formulating his opinion."

The decision in *Carter* was affirmed and reiterated by the Superior Court in the decision in *Commonwealth of Pennsylvania v. Twitty,* 876 A.2d 433 (Pa. Super. 2005). In *Twitty,* the Superior Court found that DNA reports prepared by the Philadelphia Police Department crime lab containing expert conclusions did not qualify as an admissible business record. Nonetheless, the *Twitty* court found the admission of the report was harmless error because the laboratory supervisor had been qualified and did testify as an expert witness and had grounded his testimony on his own expert analysis of the information contained in the lab report. The opinion evidence was therefore subject to cross-examination and admissible.

Here, although the defense had the ability to present the Belgium report in cross-examination of plaintiff's expert or as part of direct examination of any defense expert, defendants withheld the Belgium report until the very end of trial in order to avoid any cross-examination of its contents. The mere certification of a document does not make opinion evidence of an allegedly expert nature admissible. Even hospital records, admissible as business records to establish the fact of hospitalization and the fact and dates of treatment, may not be admitted as substantive medical expert opinion.[80]

One may wonder whether expert opinion certified by the government of Canada might be more acceptable than that certified by the government of Belgium which would in turn be more acceptable than that certified from a third world nation such as Iran, Afghanistan, Libya or Iraq. Indeed, by defendant's theory of expert opinion evidence the "scientific" orthodoxy of any rogue nation could be presented without exposure to cross-examination or even

80. *Commonwealth v. DiGiacomo,* 463 Pa. 449, 345 A.2d 605 (1975); *Paxos v. Jarha Corp.,* 314 Pa. 148, 171 A.468 (1934).

evaluation of the credentials of the authors beyond their local political pedigree.[81] Accordingly, the Belgium report is clearly inadmissible at the new trial.

For the reasons set forth above the decision granting a new trial as to liability only and the denial of all other post verdict motions should be affirmed.

---

81. The court notes in passing that the official doctrine of the Soviet Union declared the Lysenko theories of evolution by organisms inheriting acquired traits were official scientific truth. The court notes the pronouncements of the South African Ministry of Health that HIV is not related to AIDS. It is entirely foreseeable that scientific theory based on religious tracts and dogma could be certified as official documents and, pursuant to this novel theory of expert opinion testimony, become substantively admissible solely because of the certification afforded by the official seal of a foreign nation whose science is grounded in medieval religious doctrine.